**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

JUAN SEBASTIÁN CARVAJAL-MUÑOZ,

*Plaintiff,*

v.

JACK CORY RAVENCAMP, JAVAKA Y. THOMPSON, DAISY I. ANGULO, JAMES PETERS, and JOHN STALNIK,

*Defendants.*

Civil No. 2:26-cv-00190-JCN

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

1. People in the United States have the right to go about their daily lives without being suddenly and violently abducted because of their skin color or ethnicity, or for no reason at all. This suit seeks to vindicate that right and to redress grave constitutional violations.

2. Juan Sebastián Carvajal-Muñoz ("Sebastián") moved to Maine from Colombia on a student visa to earn his master's degree in civil engineering at the University of Maine. He then accepted a job as a civil engineer, specializing in conducting soil and foundation analyses for bridge construction across Maine. He was invited to stay in the United States under the H-1B visa program, which permits noncitizens to work legally in the U.S. if they can "perform services of exceptional merit and ability."

3. On the morning of January 22, 2026, during the federal government's "Operation Catch of the Day" immigration crackdown in Maine, armed federal agents abducted Sebastián while he was driving to work. They cut in front of Sebastián's car, bashed in his window, dragged him out of the car, handcuffed him, and left his car running in the middle of the street in downtown Portland.

4. Sebastián offered proof of his lawful immigration status. Yet the agents told Sebastián that his visa would be revoked and placed him in full-body shackles.

5. Agents then drove Sebastián around for hours, refused to release him despite instruction to do so, and instead locked him in a windowless cell in an ICE facility in Massachusetts. As abruptly as the agents had abducted him, they released him in Burlington, Massachusetts, after 9 p.m. that night, leaving him to find his way back home.

6. Defendants' actions were unconstitutional for multiple reasons. First, federal agents stopped Sebastián without any reasonable suspicion that he was in the country unlawfully or had committed any other offense. Second, federal agents arrested him without a warrant and without probable cause to believe he was removable, ignoring proffered proof that he had lawful immigration status. Third, federal agents engaged in discrimination, arresting Sebastián for no reason other than his apparent race, skin color, or ethnicity. Fourth, federal agents used unreasonable force and violence against Sebastián, pointlessly breaking his car window, dragging him from his car, and placing him in full-body shackles. And fifth, independent of the unlawfulness of the seizure at its inception, the length of time agents kept Sebastián detained was likewise unreasonable and unconstitutional. The federal agents' conduct violated the constitutional guarantees of equal protection and freedom from unreasonable search and seizure under the Fourth and Fifth Amendments.

7. This abduction profoundly harmed Sebastián. He continues to fear that he could again be racially profiled and unjustly arrested by federal agents. Given the utter unlawfulness of the arrest, he worries that no amount of proof or documentation can keep him safe. Sebastián seeks compensatory damages arising from the unlawful arrest and detention, and punitive damages to deter future unconstitutional conduct.

8. The federal agents' conduct toward Sebastián is consistent with DHS's broader campaign of conducting mass immigration arrests without a warrant or any lawful basis. DHS's dragnet ensnares noncitizens based solely on their race, skin color or ethnicity, including individuals like Sebastián with lawful immigration status. These brutal stops and arrests terrorize Maine's immigrant communities and disrupt even the most ordinary of activities—working, going to school, shopping, driving.

9. Sebastián is entitled to relief for the constitutional injuries caused by federal agents. He pursues relief on a subset of his claims under *Bivens*, and he pursues relief on all of his claims under the Maine Civil Rights Act, which provides a state-law cause of action for violations of the federal constitution by federal officers. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); 5 M.R.S. § 4682.

**Parties**

10. Plaintiff Juan Sebastián Carvajal-Muñoz is an adult resident of Portland, Maine, living and working in the United States on a valid H-1B work visa. Sebastián was stopped, arrested, shackled, and detained by federal agents on January 22, 2026.

11. Defendant Jack Cory Ravencamp is a federal agent who directly participated in the stop and arrest of Sebastián on January 22, 2026. At all times relevant to this complaint, Agent Ravencamp was employed by or contracted to perform services for U.S. Immigration and Customs Enforcement ("ICE"), a component of the U.S. Department of Homeland Security ("DHS"), and was acting under color of federal law. Agent Ravencamp is sued in his individual capacity.

12. Defendant Javaka Y. Thompson is a masked male federal agent who directly participated in the stop and arrest of Sebastián on January 22, 2026. At all times relevant to this complaint,

Agent Thompson was employed by or contracted to perform services for DHS and was acting under color of federal law. Agent Thompson is sued in his individual capacity.

13. Defendant Daisy I. Angulo is a masked female federal agent who directly participated in the stop and arrest of Sebastián on January 22, 2026. At all times relevant to this complaint, Agent Angulo was employed by or contracted to perform services for DHS and was acting under color of federal law. Agent Angulo is sued in her individual capacity.

14. Defendant James Peters is one of two male federal agents who refused to release Sebastián in Portland despite instruction to do so on January 22, 2026. Agent Peters was the driver in the van transporting Sebastián from Kittery to Portland and then to Biddeford. At all times relevant to this complaint, Agent Peters was employed by or contracted to perform services for the Department of Homeland Security and was acting under color of federal law. Agent Peters is sued in his individual capacity.

15. Defendant John Stalnik is the other of the two male federal agents who refused to release Sebastián in Portland despite instruction to do so on January 22, 2026. Agent Stalnik was the front-seat passenger in the van transporting Sebastián from Kittery to Portland and then to Biddeford. At all times relevant to this complaint, Agent Stalnik was employed by or contracted to perform services for the Department of Homeland Security and was acting under color of federal law. Agent Stalnik is sued in his individual capacity.

## Jurisdiction and Venue

16. This Court has subject matter jurisdiction over Plaintiff's claims because at least one claim arises under federal law under 28 U.S.C. § 1331, and there is supplemental jurisdiction over any remaining claims under 28 U.S.C. § 1367.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because Plaintiff resides in this district.

## Factual Background

### *DHS agents descend on Maine as part of "Operation Catch of the Day."*

18. In Maine and across the country, masked federal agents have launched operations to conduct mass warrantless stops and arrests, often without regard for citizenship or immigration status.

19. On January 20, 2026, DHS launched "Operation Catch of the Day," which it described as a large-scale immigration enforcement effort across Maine.[1]

20. DHS publicly claimed that Operation Catch of the Day was targeting the "worst of the worst criminal illegal aliens who have terrorized communities" across Maine, and that it had a "target list" of 1,400 people in Maine.[2]

---

[1] DHS, *ICE Launches "Operation Catch of the Day" Targeting "Worst of the Worst" Criminal Illegal Aliens* (Jan. 21, 2026), https://www.dhs.gov/news/2026/01/21/ice-launches-operation-catch-day-targeting-worst-worst-criminal-illegal-aliens.

[2] *Id.*; Ari Snider, *ICE confirms Maine immigration surge, tells Fox News nearly 50 arrests have been made so far*, Maine Public (Jan. 21, 2026, updated Jan. 23, 2026), https://www.mainepublic.org/immigration/2026-01-21/ice-confirms-maine-immigration-surge-on-fox-news-claims-nearly-50-arrests-so-far.

21. DHS later reported that ICE agents had arrested more than 200 people during the first week of the operation.[3]

22. About four percent of Maine's 1.4 million population are foreign-born. The vast majority are here lawfully.[4]

23. In reality, many of the individuals arrested during Operation Catch of the Day had not committed any crimes or violated any immigration laws.[5] Out of 192 people arrested during the operation, just 12 had criminal convictions.[6]

24. DHS agents stopped individuals based on their apparent race and ethnicity—without a warrant or probable cause—and then frequently arrested them in violation of constitutional protections.

25. As of early February 2026, nearly 50 individuals arrested in Operation Catch of the Day had challenged their detentions as unlawful in federal court.[7]

---

[3] Ari Snider & Steve Mistler, *ICE says it's arrested more than 200 people since last week in Maine operation*, Maine Public (Jan. 26, 2026), https://www.mainepublic.org/immigration/2026-01-26/ice-says-its-arrested-more-than-200-people-since-last-week-in-maine-operation.

[4] U.S. Census Bureau, *QuickFacts: Maine*, https://www.census.gov/quickfacts/fact/table/ME/PST045224 (last visited Mar. 20, 2026).

[5] Rachel Ohm, *ICE said it came to Maine to target the 'worst of the worst.' Did it?*, Portland Press Herald (Jan. 31, 2026; updated Feb. 4, 2026), https://www.pressherald.com/2026/01/31/ice-said-it-came-to-maine-to-target-the-worst-of-the-worst-did-it/.

[6] Drew Johnson, *New data indicates most arrested in Maine ICE surge had no criminal convictions, charges*, Portland Press Herald (Mar. 30, 2026, updated Mar. 31, 2026), 2026/03/30/new-data-indicates-most-arrested-in-maine-ice-surge-had-no-criminal-convictions-charges/.

[7] Callie Ferguson, *A quarter of people arrested in Maine's ICE surge are challenging their detentions*, The Maine Monitor (Feb. 9, 2026), https://themainemonitor.org/quarter-people-arrested-maine-ice-surge-challenging-detentions/.

26. Weeks later, as of early March 2026, dozens of those individuals had been ordered released from unlawful detention.[8]

27. In a January 25, 2026, text message exchange between local law enforcement and Homeland Security Investigations special agent Jeff Larocque, Agent Larocque stated: "Over 200 illegals taken off your hands. My team had two runners (Dominicans drug targets) but the young guys and gals chased them down at Market Basket." [9]

28. Although in fact only 12 of the Operation Catch of the Day arrestees had prior criminal convictions, in a text message later that same day, Agent Larocque stated: "The boss said over 260 arrests which is not bad for 4 days. Lots of African sexual assaults and Domestics. They're going back to their shithole countries."[10]

29. In a text message exchange with local law enforcement dated January 26, 2026, Agent Larocque referenced "a spreadsheet" of the arrests made during "Operation Catch of the Day" sent by the operation's "team leader."[11]

30. Cumberland County Sheriff Kevin Joyce criticized DHS agents' conduct during Operation Catch of the Day, following their arrest of what he described as a "squeaky clean" corrections officer recruit. Sheriff Joyce described DHS agents' conduct as "bush league policing"; said

[8] Rachel Estabrook & Emily Allen, *Mainers detained by ICE are coming home by the dozens*, Portland Press Herald (Mar. 1, 2026, updated Mar 2, 2026), https://www.pressherald.com/2026/03/01/mainers-detained-by-ice-are-coming-home-by-the-dozens/.

[9] *Read all of the texts between Portland, South Portland police and immigration agent*, Portland Press Herald (Mar. 12, 2026, updated Mar. 13, 2026), https://www.pressherald.com/2026/03/12/read-all-of-the-texts-between-portland-south-portland-police-and-immigration-agent/.

[10] *Id.*

[11] *Id.*

"We're being told one story, which is totally different than what's occurring…"; and noted, "I guess if you're not a card-carrying U.S. citizen, then you must be illegal."[12]

31. The unlawful practices undertaken during Operation Catch of the Day are consistent with DHS's practices throughout the U.S., which courts across the country have found unlawful. *Ramirez Ovando v. Noem*, 810 F.Supp.3d 1209, 1231 (D. Colo. 2025); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.3d 1, 49 (D.D.C. 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 734 (E.D. Cal. 2025); *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823 (N.D. Ill. 2025).

***ICE targets Juan Sebastián Carvajal-Muñoz, a civil engineer with a spotless record.***

32. One of the hundreds of individuals ensnared by "Operation Catch of the Day" was Juan Sebastián Carvajal-Muñoz.

33. Sebastián is originally from Colombia.

34. He came to Maine in 2021 to complete graduate work in geotechnical engineering at the University of Maine in Orono.

35. Sebastián earned his master's degree in civil engineering from the University of Maine in May 2023.

36. Associate Professor of Civil Engineering Aaron Gallant, who directly supervised Sebastián at the University of Maine, described him as one of the hardest-working students he has ever had:

---

[12] Patty Wight, *Cumberland County Sheriff Kevin Joyce denounces actions by ICE agents in Maine*, Maine Public (Jan. 22, 2026), https://www.mainepublic.org/courts-and-crime/2026-01-22/cumberland-county-sheriff-kevin-joyce-denounces-actions-by-ice-agents-in-maine

"[T]he entire department and faculty look very highly on Juan Sebastián. … I know his employers have been extremely happy with his performance as they've communicated to me regularly."[13]

37. In June 2023, Sebastián moved to Portland and began working for GEI Consultants, an engineering and environmental consulting firm. GEI Consultants specializes in water, energy, buildings, and infrastructure in Maine and nationwide, with over 60 offices throughout North America.

38. Sebastián specializes in conducting soil and foundation analyses for the construction and repair of bridges in communities across Maine. Sebastián oversees subsurface exploration for Maine Department of Transportation-operated bridges, solar projects, and residential areas and supports preparing geotechnical reports and calculation packages for these projects. He also oversees geotechnical instrumentation installation and performs construction observation for pile installation and dam rehabilitation. He has performed work in support of construction projects across the state, including bridge work in Turner, Warren, Dover-Foxcroft and Ellsworth, and solar projects in Peru and Clinton.

39. Sebastián has maintained lawful immigration status throughout his time in the United States, first on an F-1 student visa and then on an H-1B specialty occupation visa available to individuals who possess highly specialized skills.

40. Sebastián has no criminal record.

---

[13] Rose Lundy & Josh Keefe, *Masked agents detain civil engineer in Portland, leave his car running in the street with a smashed window*, The Maine Monitor (Jan. 22, 2026), https://themainemonitor.org/masked-agents-smash-window-detain-engineer-portland/.

***Federal agents stop and arrest Sebastián on his way to work.***

41. At around 8:45 a.m. on January 22, 2026, Sebastián was driving on Pearl Street in Portland. He was on his way to work.

42. Sebastián was complying with all traffic laws and had his car's dashcam operating.

43. Suddenly, a dark unmarked Subaru Ascent (Minnesota license plate number 663-WER) cut him off.

44. Three armed federal immigration agents in tactical police vests—a bearded, unmasked man (Agent Jack Cory Ravencamp), a masked man (Agent Javaka Y. Thompson), and a masked woman (Agent Daisy I. Angulo)—quickly exited the unmarked SUV and surrounded Sebastián's car.




*Figure 1: Masked Agent Thompson and masked Agent Angulo exiting the unmarked SUV to surround Sebastián's car.*

45. Agent Thompson approached the driver's side window and demanded Sebastián's paperwork.

46. Sebastián showed his REAL ID to Agent Thompson through the driver's side window.

47. REAL IDs are issued to non-citizens only if they have documented lawful status.

48. Agent Thompson told him to step out of his car.

49. Sebastián grabbed his phone to record the incident and call for help. Seconds later, Agent Thompson smashed his driver's side window with a crowbar.

50. Shards of shattered glass went everywhere, including on the driver's seat and in Sebastián's jacket.

51. Agent Thompson forced open Sebastián's car door and dragged him out of the car.

52. Agent Ravencamp pointed a taser at Sebastián.



*Figure 2: Agent Ravencamp pointing taser at Sebastián through smashed driver's-side window.*

53. The agents handcuffed Sebastián, transferred him to the back of the unmarked SUV, and drove away.

54. Sebastián was afraid for his life, especially after seeing what had happened to Renée Good in Minnesota two weeks earlier.

55. The encounter lasted approximately two minutes.

56. The agents left Sebastián's car running with its window smashed.

57. The agents left Sebastián's bag and keys on the passenger seat. They left his phone on the street near the car.

58. The agents provided no reason or explanation—at the time of the abduction or at any subsequent time—for the initial stop or the subsequent arrest.

59. The agents did not indicate—at the time of the abduction or at any subsequent time—that they had a warrant for Sebastián's arrest.

60. Sebastián's car is registered with the Maine Bureau of Motor Vehicles in his name, "Juan Sebastián Carvajal-Muñoz."

61. At the time the agents stopped Sebastián, the only information they had about him was his physical appearance and the fact that the vehicle was registered to a Hispanic-sounding name, "Juan Sebastián Carvajal-Muñoz."

62. The agents had no basis to stop Sebastián other than his apparent race, skin color or ethnicity.

***Federal agents detain Sebastián for hours.***

63. The three arresting agents (Agent Ravencamp, Agent Thompson, and Agent Angulo) drove Sebastián around Portland for over an hour.

64. They stopped at a Home Depot in South Portland at approximately 10 a.m.

65. In the Home Depot parking lot, the agents checked Sebastián's immigration status online. Agent Angulo filled out a "Catch of the Day" online form on her laptop. Agent Thompson photographed Sebastián's face.

66. Sebastián told the agents that he had a valid H1-B visa and that he had a copy of his Form I-94 in his wallet.

67. Sebastián's Form I-94, issued by U.S. Customs and Border Protection, documents his H1-B visa status, valid through September 2027.

68. Agent Thompson confirmed that, based on information he looked up on a database, he could see that Sebastián held a valid H1-B visa.

69. The agents took Sebastián's wallet but refused to look at the copy of his Form I-94.

70. The agents told Sebastián they were taking him to the ICE facility in Burlington, Massachusetts.

71. The agents told Sebastián that his H1-B visa would be revoked and he would be taken to an immigration judge in Massachusetts.

72. Sebastián felt powerless and helpless. He knew he had all his paperwork and had done nothing wrong, and yet this meant nothing to the agents.

73. In addition to taking Sebastián's wallet, agents also took his office card keys and watch.

74. The agents removed Sebastián from the unmarked SUV and placed his feet in shackles.

75. The agents transferred Sebastián to an unmarked white van.

76. The unmarked white van drove to a parking lot near a Dunkin' Donuts in Gray, Maine, where additional shackled detainees were loaded onto the van.

77. At this point there were four shackled detainees in the van other than Sebastián, all people of color. Two were Black and two were Hispanic.

78. At about 12 p.m., Sebastián and the other detainees arrived at a parking lot near the railroad tracks in Biddeford, Maine.

79. Sebastián and the other detainees were transferred to another unmarked white van, New Hampshire plates 541-8700. There were now around fifteen people in the van. Again, all of the detainees were people of color.

80. The agents confiscated all of the detainees' shoelaces and personal belongings.

81. Sebastián and the other shackled detainees were driven south toward the Burlington ICE facility.

***Federal agents refuse to release Sebastián even after they are instructed to do so.***

82. At around 1 p.m., the van stopped at the Kittery, Maine, police station.

83. Sebastián was seated in the front, just behind the agent driving the van.

84. The driver communicated with other agents on a group chat called "Maine Transportation."

85. A message had popped up on the group chat asking about Juan Carvajal's location.

86. The driver asked, "Who is Juan?"

87. Sebastián—whose full first and middle name is Juan Sebastián—identified himself. The driver said to Sebastián, "We have good news, someone is coming for you."

88. The van waited at the Kittery police station for about an hour, at which point another white van, driven by an older, male agent (Agent James Peters) with another older, male agent in the van's front passenger seat (Agent John Stalnik), arrived to pick up Sebastián. Sebastián was the only detainee transported in this van.




*Figure 3:*
*Sebastián being transferred at the Kittery police station.*

89. Agent Peters and Agent Stalnik brought Sebastián back to Portland and asked where he wanted to be dropped off. He asked to be dropped off at Lincoln Park, near the location on Pearl Street where he had been detained earlier.

90. Agent Peters and Agent Stalnik drove Sebastián near Lincoln Park but they refused to stop. Instead, they drove him around Portland.

91. Sebastián felt the agents were mocking him, giving him false hopes only to dash those hopes. He was humiliated.

92. Between 3 and 4 p.m., Agent Peters and Agent Stalnik drove Sebastián back to the railroad tracks in Biddeford, where he had been transferred from one white van to another earlier that day.

93. The agents transferred him to a bus that was idling in the parking lot. A number of shackled detainees were already on the bus.

94. The bus had wire mesh on the windows and appeared to be designed for prisoner transport.

95. An agent told Sebastián that he needed to either cut the drawstring on his jacket or else give the jacket to him. Sebastián gave the agent his jacket.

96. The agents told the detainees that they would be driving to Burlington, Massachusetts, and that if they needed to urinate before the drive, they should go in the parking lot. Sebastián and several other detainees urinated in public in the parking lot.

97. Sebastián felt exposed, forced to conduct one of the most private human activities in public.

98. Sebastián and the other shackled detainees waited on the bus in Biddeford for several hours, until around 6 p.m.

99. Over that period, several more detainees were loaded onto the bus from different white vans.

100. Altogether about ten shackled detainees were loaded onto the bus, along with several federal agents. Again, all detainees were people of color: about three or four were Black, and all others were Hispanic.

101. The experience of being driven back to Portland, only to be once again driven to Biddeford, was frightening and disorienting.

***Federal agents lock Sebastián in a cell at an ICE facility in Massachusetts.***

102. Sebastián and the other detainees were driven south to an ICE facility in Burlington, Massachusetts. They arrived at about 8 p.m., nearly twelve hours after agents had first stopped and detained Sebastián.

103. Agents transferred Sebastián and the other detainees to a locked cell in the ICE facility. There were about 20 to 30 other detainees in the cell.

104. The cell had no windows, limited airflow, and no showers. There was a single toilet in the open in the cell, surrounded by a low divider. There were aluminum blankets but no beds or other furniture in the cell.

105. After Sebastián was locked in the cell, agents removed the shackles.

106. Agents gave Sebastián a small portion of macaroni and cheese, the first food he had been given since he was detained that morning.

107. Approximately 20 to 30 minutes after agents locked Sebastián in the cell, an agent asked for "Juan Sebastián." Sebastián identified himself.

108. The agent told Sebastián he was "not supposed to be there" and was free to go.

109. Sebastián asked the agents where his car and phone were; they did not provide any information.

110. Sebastián was given a schedule for the Concord Coach bus to Portland.

111. Sebastián took a cab to South Station and then took the Concord Coach bus back to Portland, at his own expense.

112. Sebastián arrived at the Portland bus station at around midnight, over fifteen hours after he had been suddenly stopped and detained.

***DHS's abduction of Sebastián inflicts immediate and ongoing harms.***

113. DHS agents' January 22 arrest and detention of Sebastián inflicted immediate and ongoing physical and psychological harm.

114. The full-body shackles that agents placed on Sebastián for around twelve hours left his ankles and wrists painful and sore.

115. Sebastián had trouble eating and drinking for days following the incident because he lost his appetite.

116. For approximately one month following the incident, Sebastián did not feel safe living in his own home in Portland.

117. Sebastián continues to live with the constant fear and anxiety of re-abduction.

## Legal Background

***Sebastián is entitled to relief for his constitutional injuries caused by federal agents.***

118. Since the Founding, the Supreme Court has recognized that rights, to be meaningful, must be paired with remedies. *See Marbury v. Madison*, 5 U.S. 137, 163 (1803).

119. For most of our history, state-law causes of action were the traditional means to seek relief for a constitutional violation by a federal officer.

120. The Maine Civil Rights Act provides a state-law cause of action for violations of federal law by federal officers: it affords a cause of action for violations of "the rights secured by the United States Constitution" by "any person, whether or not acting under color of law." 5 M.R.S. § 4682.

121. In the Westfall Act of 1988, Congress amended the Federal Tort Claims Act ("FTCA") to provide that a suit against the United States is generally the exclusive remedy for tortious conduct of government employees acting within the scope of their employment. 28 U.S.C. § 2679(b)(1). But Congress also enacted a crucial exception to this rule: the FTCA's exclusive-remedy provision "does not extend or apply to a civil action against an employee of the Government [] which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A) (hereinafter the "Westfall carveout").

122. The Maine Civil Rights Act, first enacted in 1989, does just that: it provides a state-law remedy for a violation of the Constitution of the United States, and therefore claims for

constitutional violations under the Maine Civil Rights Act fall squarely within the Westfall carveout.

123. Although Sebastián also seeks relief by way of an implied damages cause of action under *Bivens*, the availability of that relief has been sharply limited. *Ziglar v. Abbas*i, 582 U.S. 120 (2017).

124. The Supreme Court has stated "that expanding the *Bivens* remedy is now a disfavored judicial activity," *id.*, and has instructed courts to permit *Bivens* claims rarely if ever. *See Egbert v. Boule*, 596 U.S. 482 (2022).

125. Under this framework, some of the violations of Sebastián's rights—such as his equal protection claim that federal agents targeted him for arrest based on his apparent ethnicity—cannot be pursued as *Bivens* claims, and the Defendants are likely to contend that the remaining *Bivens* claims (set forth below) also fail.

126. If Sebastián's *Bivens* claims do not move forward, the Maine Civil Rights Act provides the only remaining vehicle for Sebastián to pursue his constitutional claims against the federal officers who have wronged him.

## Claims for Relief

### Count I
### Suspicionless Stop in Violation of Fourth Amendment
### U.S. Const. amend IV., Maine Civil Rights Act, 5 M.R.S. § 4682

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

127. Plaintiff re-alleges and incorporates all of the foregoing allegations.

128. Under the Fourth Amendment to the U.S. Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend IV.

129. Officers are permitted to briefly stop individuals only to make "reasonable inquiries" based on "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

130. Immigration officers may stop vehicles only with specific articulable facts reasonably warranting suspicion that the vehicle contains individuals in the country unlawfully; an individual's apparent race or ethnicity alone does not establish reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86 (1975); *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015).

131. Defendants' suspicionless stop of Sebastián violated his Fourth Amendment right to be free from unreasonable seizure.

132. Defendants intentionally interfered with Sebastián's Fourth Amendment rights by physical force or violence and by engaging in conduct that would cause a reasonable person to suffer emotional distress or fear bodily injury, in violation of the Maine Civil Rights Act, 5 M.R.S. § 4682.

133. Sebastián's claim under the Maine Civil Rights Act is a claim "brought for a violation of the Constitution of the United States," within the meaning of the Westfall carveout. 28 U.S.C. § 2679(b)(2)(A).

134. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count II**
**Warrantless Arrest Without Probable Cause in Violation of Fourth Amendment**
**U.S. Const. amend IV, Maine Civil Rights Act, 5 M.R.S. § 4682**

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

135. Plaintiff realleges and incorporates all of the foregoing allegations.

136. Except at the border and its functional equivalents, the Fourth Amendment prohibits immigration agents from arresting an individual without probable cause that the individual is in the United States in violation of an immigration law; an arrest based on "nothing more than possible removability" violates the Fourth Amendment. *Arizona v. United States*, 567 U.S. 387, 407 (2012); *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015).

137. Defendants' warrantless arrest of Sebastián without probable cause of removability violated his Fourth Amendment right to be free from unreasonable seizure.

138. Defendants intentionally interfered with Sebastián's Fourth Amendment rights by physical force or violence, by damage to property, and by engaging in conduct that would cause a reasonable person to suffer emotional distress or fear bodily injury, in violation the Maine Civil Rights Act, 5 M.R.S. § 4682.

139. Sebastián's claim under the Maine Civil Rights Act is a claim "brought for a violation of the Constitution of the United States," within the meaning of the Westfall carveout. 28 U.S.C. § 2679(b)(2)(A).

140. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count III**
**Excessive Force in Violation of Fourth Amendment**
**U.S. Const. amend. IV, Maine Civil Rights Act, 5 M.R.S. § 4682**

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

141. Plaintiff realleges and incorporates all of the foregoing allegations.

142. The reasonableness of the use of force used by police officers is judged against an objective standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Assessing reasonableness involves balancing the nature and quality of the intrusion on the individual's Fourth Amendment rights against the government interests in effecting the seizure. *Scott v. Harris*, 550 U.S. 372, 383 (2007).

143. The force used by Defendants when conducting the stop and arrest of Sebastián—including breaking his car window, dragging him from his car, and placing him in full-body shackles—was objectively unreasonable under the circumstances, particularly given the lack of any legitimate government interest in conducting the seizure and the lack of any indication that Sebastián was resisting or attempting to evade arrest.

144. Defendants' use of excessive force toward Sebastián violated his Fourth Amendment right to be free from unreasonable seizure.

145. Defendants intentionally interfered with Sebastián's Fourth Amendment rights by physical force or violence, by damage to property, and by engaging in conduct that would cause a reasonable person to suffer emotional distress or fear bodily injury, in violation the Maine Civil Rights Act, 5 M.R.S. § 4682.

146. Sebastián's claim under the Maine Civil Rights Act is a claim "brought for a violation of the Constitution of the United States," within the meaning of the Westfall carveout. 28 U.S.C. § 2679(b)(2)(A).

147. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count IV**
**Race Discrimination in Violation of Equal Protection Guarantee of Fifth Amendment**
**U.S. Constitution Amend. V, Maine Civil Rights Act, 5 M.R.S. § 4682**

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

148. Plaintiff realleges and incorporates all of the foregoing allegations.

149. The Fifth Amendment's Due Process Clause embodies an equal protection guarantee. *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954). Government action motivated by animus based on race, ethnicity, national origin, or religion is unconstitutional. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

150. A plaintiff prevails on an Equal Protection claim by demonstrating, through direct or circumstantial evidence, that the government's conduct was motivated at least in part by discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

151. Defendants did not provide any reason or explanation—at the time of the abduction or at any subsequent time—for the initial stop or the subsequent arrest.

152. At the time Defendants stopped Sebastián, the only information they had about him was his appearance and the fact that the vehicle was registered to "Juan Sebastián Carvajal-Muñoz." Defendants had no basis for the stop other than his apparent race, skin color or ethnicity.

153. Defendants targeted Sebastián for stop and arrest based on his perceived race, skin color or ethnicity (Hispanic).

154. Defendants' stop and arrest based on his perceived race, skin color or ethnicity violated the Fifth Amendment equal protection guarantee, which requires that all people be treated equally under the law without regard to race, ethnicity, or national origin.

155. Defendants intentionally interfered with Sebastián's Fifth Amendment equal protection rights by physical force or violence, by damage to property, and by engaging in conduct that would cause a reasonable person to suffer emotional distress or fear bodily injury, in violation the Maine Civil Rights Act, 5 M.R.S. § 4682.

156. Sebastián's claim under the Maine Civil Rights Act is a claim "brought for a violation of the Constitution of the United States," within the meaning of the Westfall carveout. 28 U.S.C. § 2679(b)(2)(A).

157. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count V**
**Prolonged Detention in Violation of Fourth Amendment**
**U.S. Const. amend. IV, Maine Civil Rights Act, 5 M.R.S. § 4682**

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, Daisy I. Angulo, James Peters, and John Stalnik***

158. Plaintiff realleges and incorporates all of the foregoing allegations.

159. Even if a limited detention is justified at its inception, a stop becomes unconstitutional if it is prolonged beyond the time necessary to effectuate the stop's purpose. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015).

160. Defendants significantly prolonged the initial stop of Sebastián beyond the time necessary to effectuate its purpose.

161. Even after Defendants investigated and confirmed Sebastián's lawful immigration status, and even after Defendants were expressly instructed to release Sebastián, they refused to release him and instead continued to detain him for hours without any justification.

162. Independent of the unlawfulness of the stop at its inception, Defendants' prolonged detention of Sebastián beyond the time necessary to effectuate the initial stop's purpose violated his Fourth Amendment right to be free from unreasonable seizure.

163. Defendants intentionally interfered with Sebastián's Fourth Amendment rights to be free unreasonable seizure by physical force or violence, by damage to property, and by engaging in conduct that would cause a reasonable person to suffer emotional distress or fear bodily injury, in violation the Maine Civil Rights Act, 5 M.R.S. § 4682.

164. Sebastián's claim under the Maine Civil Rights Act is a claim "brought for a violation of the Constitution of the United States," within the meaning of the Westfall carveout. 28 U.S.C. § 2679(b)(2)(A).

165. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

## Count VI
## Suspicionless Stop in Violation of Fourth Amendment
## U.S. Const. amend IV, *Bivens*

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

166. Plaintiff realleges and incorporates all of the foregoing allegations.

167. Under the Fourth Amendment to the U.S. Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend IV.

168. Officers are permitted to briefly stop individuals only to make "reasonable inquiries" based on "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

169. Immigration officers may stop vehicles only with specific articulable facts reasonably warranting suspicion that the vehicle contains individuals in the country unlawfully; an individual's apparent race or ethnicity alone does not establish reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86 (1975); *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015).

170. Defendants' suspicionless stop of Sebastián violated his Fourth Amendment right to be free from unreasonable seizure.

171. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count VII**
**Warrantless Arrest Without Probable Cause in Violation of Fourth Amendment**
**U.S. Const. amend. IV, *Bivens***

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

172. Plaintiff realleges and incorporates all of the foregoing allegations.

173. Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from arresting an individual without probable cause that the individual is in the United States in violation of an immigration law; an arrest based on "nothing more than possible

removability" violates the Fourth Amendment. *Arizona v. United States*, 567 U.S. 387, 407 (2012); *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015).

174. Defendants' warrantless arrest of Sebastián without probable cause of removability violated his Fourth Amendment right to be free from unreasonable seizure.

175. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count VIII**
**Excessive Force in Violation of Fourth Amendment**
**U.S. Const. amend. IV, *Bivens***

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo***

176. Plaintiff realleges and incorporates all of the foregoing allegations.

177. The reasonableness of the use of force used by police officers is judged against an objective standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Reasonableness turns on a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment rights against the government interests in effecting the seizure. *Scott v. Harris*, 550 U.S. 372, 383 (2007).

178. The force used by Defendants when conducting the stop and arrest of Sebastián—including breaking his car window, dragging him from his car, and placing him in full-body shackles—was objectively unreasonable under the circumstances, particularly given the lack of any legitimate government interest in conducting the seizure and the lack of any indication that Sebastián was resisting or attempting to evade arrest.

179. Defendants' use of excessive force toward Sebastián violated his Fourth Amendment right to be free from unreasonable seizure.

180. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Count IX**
**Prolonged Detention in Violation of Fourth Amendment**
**U.S. Constitution amend. IV, *Bivens***

***Defendants Jack Cory Ravencamp, Javaka Y. Thompson, Daisy I. Angulo, James Peters, and John Stalnik***

181. Plaintiff realleges and incorporates all of the foregoing allegations.

182. Even if a limited detention is justified at its inception, a stop becomes unconstitutional if it is prolonged beyond the time necessary to effectuate the stop's purpose. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015).

183. Defendants significantly prolonged the initial stop of Sebastián beyond the time necessary to effectuate its purpose.

184. Even after Defendants investigated and confirmed Sebastián's lawful immigration status, and even after Defendants were expressly instructed to release Sebastián, they refused to release him and instead continued to detain him for hours without any justification.

185. Independent of the unlawfulness of the stop at its inception, Defendants' prolonged detention of Sebastián beyond the time necessary to effectuate the initial stop's purpose violated his Fourth Amendment right to be free from unreasonable seizure.

186. Defendants acted with reckless or callous indifference to Sebastián's federally protected rights and therefore are liable for punitive damages.

**Prayer for Relief**

187. Plaintiff therefore respectfully requests that the Court enter a judgment including, but not limited to:

188. Compensatory damages to compensate for the physical, mental, financial, and reputational harms and other harms and losses from Defendants' actions;

189. Punitive damages to deter future constitutional violations;

190. Expungement of any arrest record that resulted from the constitutional violations;

191. An award to Plaintiff of attorneys' fees and costs; and

192. Any such additional and further relief as the Court deems just and proper.

**Jury Demand**

193. Plaintiff requests a trial by jury on all claims.

Date: The 20th day of July, 2026

Respectfully submitted,

JUAN SEBASTIÁN CARVAJAL-MUÑOZ.

By his attorneys:

/s/ Carol Garvan

Carol Garvan
Zachary L. Heiden
Max Brooks
ACLU of Maine Foundation
PO Box 7860
Portland, Maine 04112
(207) 619-8687
cgarvan@aclumaine.org
zheiden@aclumaine.org
mbrooks@aclumaine.org

Benjamin R. Gideon
Taylor A. Asen
Rosalie B.C. Wennberg
Gideon Asen LLC
95 Main Street, No.5
Auburn, Maine 04210

(207) 206-8982
service@gideonasenlaw.com
rwennberg@gideonasenlaw.com

James Wagner
Law Office of James Wagner
343 Ocean House Road
Cape Elizabeth, Maine 04107
(207) 400-6038
jamiewagnerlaw@gmail.com

Scott Michelman (D.C. Bar No. 1006945)*
Laura Follansbee (D.C. Bar No. 1782046)*
ACLU Foundation of the District of Columbia
529 14th St. NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
smichelman@acludc.org
lfollansbee@acludc.org

Julie A. Murray (D.C. Bar No. 1003807)*
Matthew R. Segal (D.C. Bar No. 483486)*
American Civil Liberties Union Foundation
15th Street NW, Washington, DC 20005
(202) 675-2326
jmurray@aclu.org
msegal@aclu.org

*Counsel for Plaintiff*[14]

*Admitted *pro hac vice*.

[14] Counsel wish to acknowledge ACLU-DC paralegal Ameerah Adetoro and ACLU-ME paralegal Emma Gerber for their investigative work and assistance in the preparation of this Complaint.