**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| JUAN SEBASTIÁN CARVAJAL-MUÑOZ,<br>Plaintiff,<br>v.<br>JACK CORY RAVENCAMP, *et al.*,<br>Defendants. | No. 2:26-cv-00190-JCN |

**THE INDIVIDUAL DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General,
Torts Branch

PAUL E. WERNER
Assistant Director, Torts Branch

*/s/ John B. F. Martin*
JOHN B. F. MARTIN
Senior Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 616-4492
Email: john.b.martin@usdoj.gov

ANNA-DRAKE STEPHENS
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 255-7805
Email: anna-drake.stephens@usdoj.gov
*Counsel for Defendant Ravencamp, Thompson, Angulo, Peters and Stalnik*

# TABLE OF CONTENTS

I. **BACKGROUND** .......... 2
II. **STANDARD OF REVIEW** .......... 6
III. **ARGUMENT** .......... 7
A. A *Bivens* Remedy Is Not Available. .......... 7
1. Plaintiff's claims arise in a new *Bivens* context. .......... 8
2. Special factors counsel against a *Bivens* remedy. .......... 10
B. Qualified Immunity Bars Plaintiff's Claims. .......... 13
1. Plaintiff has failed to meet his burden on qualified immunity. .......... 16
**IV. CONCLUSION .......... 20**

## TABLE OF AUTHORITIES

Page(s)

Cases

*Alvarez v. U.S. Immigr. & Customs Enf't*,
818 F.3d 1194 (11th Cir. 2016) ........................................9, 11
*Arizona v. United States*,
567 U.S. 387 (2012)........................................11
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................ 6, 13, 14, 15, 16
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................ 6,7
*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
403 U.S. 388 (1971)........................................ 1, 7, 9
*Buchanan v. Gulfport Police Dep't*,
530 F. App'x 307 (5th Cir. 2013) ........................................ 18, 19
*Carlson v. Green*,
446 U.S. 14 (1980)........................................ 7, 12
*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001)........................................ 12, 13
*Davis v. Passman*,
442 U.S. 228 (1979)........................................ 7
*De La Paz v. Coy,*
786 F.3d 367 (5th Cir. 2015*)* ........................................9, 11
*Dist. of Columbia v. Wesby*,
583 U.S. 48 (2018)........................................ 15, 17
*E.O. v. Sessions*,
41 F.4th 664 (D.C. Cir. 2022) ........................................ 18, 19
*Edwards v. Gizzi*,
107 F.4th 81 (2d Cir. 2024)........................................ 12
*Egbert v. Boule*,
596 U.S. 482 (2022)........................................7, 8, 9, 10, 11, 12
*Enriquez-Perdomo v. Newman*,
149 F.4th 623 (6th Cir. 2025)........................................ 9
*Estate of Rahim by Rahim v. Doe*,
51 F.4th 402 (1st Cir. 2022) ........................................ 16, 17
*Foote v. Ludlow Sch. Comm*.,
128 F.4th 336 (1st Cir. 2025) ........................................ 3
*Fortuna v. Town of Winslow*,
607 F. Supp. 3d 29 (D. Me. 2022) ........................................ 3, 4
*Gent v. CUNA Mut. Ins. Soc'y*,
611 F.3d 79 (1st Cir. 2010)........................................ 3, 4, 10, 18

*Giragosian v. Ryan*,
547 F.3d 59 (1st Cir. 2008) .......... 2
*González v. Vélez*,
864 F.3d 45 (1st Cir. 207) .......... 9
*Gregorat*,
767 F.3d 103 (1st Cir. 2014) .......... 9, 10
*Hernandez v. Causey*,
124 F.4th 325 (5th Cir. 2024).......... 8,9
*Hernandez v. Mesa*,
582 U.S. 548, 553 (2017).......... 8
*Hernandez v. Mesa*,,
589 U.S. 93 (2020).......... 8
*Hornof v. United States*,
107 F.4th 46 (1st Cir. 2024) .......... 8
*Hunter v. Bryant*,
502 U.S. 224 (1991).......... 14
*Kelley v. DiPaola,*
379 F. Supp. 2d 96 (D. Mass. 2005) .......... 14
*Kisela v. Hughes*,
584 U.S. 100 (2018).......... 15, 16
*K.O. by & through E.O. v. Sessions*,
41 F. 4th 664 (2022).......... 12
*Lachance v. Town of Charlton*,
990 F.3d 14 (1st Cir. 2021) .......... 16, 22
*Malley v. Briggs*,
475 U.S. 335 (1986).......... 14
*Manis v. Lawson*,
585 F.3d 839 (5th Cir. 2009).......... 18
*McKinney v. Maine State Police*,
No. 2:25-CV-00370-SDN, 2025 WL 225188 (D. Me. Nov. 17, 2025).......... 14
*Medina-Velázquez v. Hernández-Gregorat*
767 F.3d 103 (1st Cir. 2014)……………………………3, 4, 5
*Minneci v. Pollard*,
565 U.S. 118 (2012).......... 12
*Mirmehdi v. United States*,
689 F.3d 975 (9th Cir. 2012).......... 10
*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015) .......... 16
*Mullenix v. Luna*,
577 U.S. 7 (2015).......... 15
*Noem v. Perdomo*,
__U.S.___, 146 S. Ct. 1 (2025).......... 17
*Osborn v. Haley*,
549 U.S. 225 (2007).......... 1
*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013).......... 13

*Pataud v. United States Citizenship & Immigration Servs.*,
501 F. Supp. 3d 22 (D. Mass. 2020) ..... 19
*Pearson v. Callahan*,
555 U.S. 223 (2009) ..... 15
*Quinones-Pimentel v. Cannon*,
85 F.4th 63 (1st Cir. 2023) ..... 9
*Reichle v. Howards*,
566 U.S. 658 (2012) ..... 15
*Reyes v. Molina-R,*
*odríquez*, 711 F.3d 49 (1st Cir. 2023) ..... 12
*Riley v. Alford*,
2011 U.S. Dist. LEXIS 12538 (D.N.H. Feb. 8, 2011) ..... 19
*Rivera-Corraliza v. Puig-Morales*,
794 F.3d 208 (1st Cir. 2015) ..... 16
*Rodriguez v. United States*,
575 U.S. 348 (2015) ..... 17
*Rodríquez-Reyes v. Molina-Rodríquez*,
5711 F.3d 49 (1st Cir. 2023) ..... 7
*Saucier v. Katz*,
533 U.S. 194 (2001) ..... 14, 15
*Sheikh v. U.S. Dep't of Homeland Sec.*,
106 F.4th 918 (9th Cir. 2024) ..... 9
*Tun Cos v. Perrotte*,
922 F.3d 514 (4th Cir. 2019) ..... 8, 9
*United States v. Bautista-Silva*,
567 F.3d 1266 (11th Cir. 2009) ..... 17
*United States v. Brignoni-Ponce*,
422 U.S. 873 (1975) ..... 16, 17
*United States v. Kitts*,
742 F. Supp. 1218 (W.D.N.Y. 1990) ..... 18
*United States v. Ochoa*,
2008 U.S. Dist. LEXIS 142262 (N.D. Ga. Aug. 7, 2008) ..... 19
*United States v. Peavy-Wright*,
424 F. Supp. 3d 139 (D. Me. 2019) ..... 4, 5
*Venegas v. Homan, et al*
Case No. 1:25-cv-00397 (S.D. Ala. 2026) ..... 18
*Waltermeyer v. Hazlewood*,
136 F.4th 361 (1st Cir. 2025) ..... 10
*Wilke v. Olson*,
2023 U.S. Dist. LEXIS 165978 (D. Me. Sept. 19, 2023) ..... 4, 5
*Wimberly v. Selent*,
No. 23-13550, 2024 WL 2845476 (11th Cir. June 5, 2024) ..... 12
*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ..... 7, 8, 10, 11, 12, 13

Statutes

5 U.S.C. app. § 8E ........ 12
6 U.S.C. §§ 253-254 ........ 12
8 U.S.C. § 287 ........ 9
8 U.S.C. § 1357 ........ 9
18 U.S.C. § 111(a)(1) ........ 19
28 U.S.C. §§ 2679(b)(1) ........ 1,6
Maine Civil Rights Act, 5 M.R.S. § 4682 ........ 1
Maine Public Laws Ch. 517 (Jan. 11, 2026), codified at 5 M.R.S. § 4763 ........ 2,8
Westfall Act ........ 1

Rules

Fed. R. Evid. 201(b) ........ 2
Federal Rule Of Civil Procedure 12(b)(6) ........ 1, 6, 12

Regulations

8 C.F.R. § 287 ........ 12
8 C.F.R. § 287.10 ........ 17

Other Authorities

Google Maps, ("Google Maps Parking Lot"); Google Maps Port Terminal https://www.google.com/maps/place/Top+of+the+Old+Port+Parking/@43.6604492,-70.2558152,17z/data=!3m1!4b1!4m6!3m5!1s0x4cb29c6ba7f9b061:0x4b8c273a7df55e21!8m2!3d43.6604492!4d-70.2558152!16s%2Fg%2F11c380yq15?entry=ttu&g_ep=EgoyMDI2MDcxNS4wIKXMDSoASAFQAw%3D%3D ....... 5

Google Maps, ("Google Maps Port Terminal") https://www.google.com/maps/place/Portland+Cruise+Terminal/@43.6552939,-70.2706189,14z/data=!4m10!1m2!2m1!1sportland+maine+terminal+building!3m6!1s0x4cb29c415bd774e9:0x1d38e8ebe2ec0698!8m2!3d43.659154!4d-70.2453717!15sCiBwb3J0bGFuZCBtYWluZSB0ZXJtaW5hbCBidWlsZGluZ1oiIiBwb3J0bGFuZCBtYWluZSB0ZXJtaW5hbCBidWlsZGluZ5IBD2NydWlzZV90ZXJtaW5hbJoBI0NoWkRTVWhOTUc5blMwVkpRMEZuU1VObGJWbGlaRmxuRUFF4AEA-gEECAAQQA!16s%2Fg%2F11fylk7c8b?entry=ttu&g_ep=EgoyMDI2MDYwMS4wIKXMDSoASAFQAw%3D%3D ....... 3

*ICE Launches "Operation Catch of the Day" Targeting "Worst of the Worst" Criminal Illegal Aliens*, DHS (Jan. 21, 2026), https://www.dhs.gov/news/2026/01/21/ice-launches-operation-catch-day-targeting-worst-worst-criminal-illegal-aliens ....... 2, 4

ICE's Tip Form. https://www.ice.gov/webform/ice-tip-form ....... 12

*Locate a Port of Entry* ("CBP Port of Entry Locator"), U.S. Customs and Border Protection, https://www.cbp.gov/about/contact/ports/portland-maine-0101 ....... 3

*Masked agents detain civil engineer in Portland, leave his car running in the street with a smashed window*, The Maine Monitor (Jan. 22, 2026), https://themainemonitor.org/masked-agents-smash-window-detain-engineer-portland/ ....... 4, 5

Port Facts, Three Berths ("Portland Port Facts"), City of Portland, https://www.portlandmaine.gov/969/Three-Berths. ....... 4

*Portland Mayor Mark Dion Issues Statement Regarding ICE Coming to Portland* (January 14, 2026) ("Portland Press Release"), City of Portland, Maine, https://www.portlandmaine.gov/1482/City-News?contentId=73988fa5-7f2c-4908-b6d7-46e6dd5c7324 ....... 2,3

*REAL ID Frequently Asked Questions*, U.S. Transportation Security Administration https://www.tsa.gov/realid/realid-faqs ....... 18

*QuickFacts: Portland city, Maine; Maine* ("Portland Census Quick Facts"), U.S. Census Bureau, t https://www.census.gov/quickfacts/fact/table/portlandcitymaine,ME/POP645224 ....... 3

Violation of Civil Rights or Civil Liberties Complaint, U.S. Department of Justice Office of the Inspector General, https://oig.justice.gov/hotline/civil_rights_complaints. ..........................................................12

Defendants Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") Deportation Officers Daisy I. Angulo, James Peters, Jack Cory Ravencamp, John Stalnik, and Javaka Y. Thompson ("the Individual Defendants") hereby jointly move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims brought against them by Plaintiff Juan Sebastián Carvajal-Muñoz under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and the Maine Civil Rights Act, 5 M.R.S. § 4682.

Plaintiff claims the Individual Defendants violated his Fourth Amendment rights during an immigration enforcement operation in Portland, Maine. *See generally* ECF No. 33, First Amended Complaint ("FAC"). Plaintiff asserts that Officers Angulo, Ravencamp, and Thompson wrongfully stopped, detained, and used force against him, and unlawfully prolonged his detention. *See* FAC ¶¶ 127-47, 166-86. Regarding his state-law claims, Plaintiff also asserts that those three officers' conduct violated his equal protection rights under the Fifth Amendment. *See id*. ¶¶ 128-65. Plaintiff's claims against Officers Peters and Stalnik proceed on the theory that they unlawfully prolonged his detention. *See id*. ¶¶ 158-65, 181-86.

The United States filed a notice of substitution under the Westfall Act with respect to the Maine Civil Rights Act claims against the Individual Defendants. ECF No. 38. The United States was thereby automatically substituted for the Individual Defendants as the sole defendant on those claims, and the state-law claims against the Individual Defendants were thereby dismissed. *See* 28 U.S.C. §§ 2679(b)(1) & (d)(1); *Osborn v. Haley*, 549 U.S. 225, 229 (2007).

As explained below, the *Bivens* claims should also be dismissed because Plaintiff lacks a *Bivens* remedy. Meaningful differences between this case and *Bivens* abound, making this a new *Bivens* context. Most significantly, because Congress has uniquely broad authority and expertise in this immigration context, separation-of-powers principles preclude judicial recognition of a

novel damages remedy here. In addition, Plaintiff fails to overcome the Individual Defendants' entitlement to qualified immunity because Plaintiff resisted their lawful efforts to detain him on reasonable suspicion of immigration violations. Plaintiff has failed to plead a constitutional violation, let alone a clearly established one.

## I. BACKGROUND

Through statewide and local policies, Portland operates as a sanctuary jurisdiction. *See ICE Launches "Operation Catch of the Day" Targeting "Worst of the Worst" Criminal Illegal Aliens* (Jan. 21, 2026) ("DHS Press Release"), available at https://www.dhs.gov/news/2026/01/21/ice-launches-operation-catch-day-targeting-worst-worst-criminal-illegal-aliens; FAC ¶ 19 n.1, 20.[1] A Maine statute limits state law enforcement's cooperation with the federal government on immigration matters. *See* Maine Public Laws Ch. 517 (Jan. 11, 2026), codified at 5 M.R.S. § 4763. Under that law, a state law-enforcement agency may not use state resources to "stop, arrest or search a person for immigration enforcement purposes," detain someone solely on an immigration hold, provide personal information about someone to immigration authorities, or allow its agents to perform immigration enforcement tasks pursuant to a federal deputation, with very limited exceptions. 5 M.R.S. §§ 4763(1)-4763(1)(B). The City of Portland limits local cooperation with federal immigration authorities. In a January 14, 2026 press release, Portland's mayor stated, "Know your rights and have a plan of action if ICE stops you. . . . As a reminder, Portland Police does not cooperate with ICE and they do not participate in enforcing federal immigration law." City of Portland, Maine, *Portland Mayor Mark Dion Issues Statement Regarding ICE Coming to Portland* (January 14, 2026)

---

[1] The facts are drawn from the complaint and sources referenced therein, government websites, and undisputable geographical and statistical information. These sources may be considered on a motion to dismiss, and to the extent necessary, the Individual Defendants hereby request judicial notice of them. *See generally* Fed. R. Evid. 201(b); *Giragosian v. Ryan*, 547 F.3d 59, 65-66 (1st Cir. 2008).

("Portland Press Release"), available at https://www.portlandmaine.gov/1482/City-News?contentId=73988fa5-7f2c-4908-b6d7-46e6dd5c7324.[2]

Portland has a relatively large immigrant population compared to Maine as a whole. About four percent of Maine's population of 1.4 million people is foreign-born, while about 11.8% of Portland's 69,508 residents are foreign-born. *See* FAC ¶ 22 n.4; U.S. Census Bureau, *QuickFacts: Portland city, Maine; Maine* ("Portland Census Quick Facts"), available at https://www.census.gov/quickfacts/fact/table/portlandcitymaine,ME/POP645224.[3] The Port of Portland, located within the city, is a U.S. Customs and Border Patrol port of entry. *See* U.S. Customs and Border Protection, *Locate a Port of Entry* ("CBP Port of Entry Locator"), available at https://www.cbp.gov/about/contact/ports/portland-maine-0101; Google Maps, https://www.google.com/maps/place/Portland+Cruise+Terminal/@43.6552939,-70.2706189,14z/data=!4m10!1m2!2m1!1sportland+maine+terminal+building!3m6!1s0x4cb29c415bd774e9:0x1d38e8ebe2ec0698!8m2!3d43.659154!4d-70.2453717!15sCiBwb3J0bGFuZCBtYWluZSB0ZXJtaW5hbCBidWlsZGluZ1oiIiBwb3J0bGFuZCBtYWluZSB0ZXJtaW5hbCBidWlsZGluZ5IBD2NydWlzZV90ZXJtaW5hbJoBI0NoWkRTVWhOTUc5blMwVkpRMEZuU1VObGJWbGlaRmxuRUFF4AEA-gEECAAQQA!16s%2Fg%2F11fylk7c8b?entry=ttu&g_ep=EgoyMDI2MDYwMS4wIKXMDSo

[2] As part of a government website whose contents are not reasonably subject to dispute, the press release is subject to judicial notice and may be considered on a motion to dismiss. *See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010).

[3] This U.S. Census Bureau data may be considered on a motion to dismiss because the complaint incorporates by reference data from the same government webpage. The data also comes from a government website subject to judicial notice. *See Gent*, 611 F.3d 79 at n.5; *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 342 n.4 (1st Cir. 2025); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014); *Fortuna v. Town of Winslow*, 607 F. Supp. 3d 29, 35 (D. Me. 2022).

ASAFQAw%3D%3D ("Google Maps Port Terminal"); City of Portland, Port Facts, Three Berths ("Portland Port Facts"), available at https://www.portlandmaine.gov/969/Three-Berths.[4]

On January 20, 2026, the Department of Homeland Security ("DHS") launched a large-scale immigration enforcement effort across Maine called "Operation Catch of the Day." FAC ¶ 19. In a press release, DHS stated that the operation "target[ed] the worst of the worst criminal illegal aliens who have terrorized communities," and said that the first-day arrestees included people convicted of aggravated assault, false imprisonment, and endangering the welfare of a child. DHS Press Release; *see* FAC ¶ 19 n.1, 20.[5] DHS arrested up to 200 people during the operation, including twelve people with criminal convictions. FAC ¶¶ 21, 23. Some of the arrestees were released from detention upon court orders. *See id*. ¶¶ 25-26. In text messages between law enforcement officers on January 25 and 26, an ICE agent stated he had apprehended 200 people illegally present in the country, had arrested Africans for sexual assault and domestic violence offenses, and had received a spreadsheet of arrests from the "team leader" for "Operation Catch of the Day." *See id*. ¶¶ 27-29.

At about 8:45 a.m. on January 22, Plaintiff, a foreign-born non-citizen holding an H-1B work visa, was driving his car on Pearl Street. *See id*. ¶¶ 10, 41. Plaintiff was near the Top of the Old Port parking lot between Cumberland and Congress Streets, which is less than a mile from the Port of Portland. *See id*. ¶¶ 36 n.13, 44; Rose Lundy & Josh Keefe ("Lundy & Keefe"), *Masked agents detain civil engineer in Portland, leave his car running in the street with a*

---

[4] The location of the Port of Entry is subject to judicial notice because it is derived from a government website and map data whose contents are widely known and not reasonably subject to dispute. *See Gent*, 611 F.3d 79 at n.5; *Wilke v. Olson*, 2023 U.S. Dist. LEXIS 165978 at *17 (D. Me. Sept. 19, 2023); *United States v. Peavy-Wright*, 424 F. Supp. 3d 139, 141 n.1 (D. Me. 2019).

[5] Because the complaint incorporates the press release by reference and the release is part of a government website subject to judicial notice, it may be considered on a motion to dismiss. See *Gent*, 611 F.3d 79 at n.5; *Medina-Velázquez*, 767 F.3d at 108.

*smashed window*, The Maine Monitor (Jan. 22, 2026), available at https://themainemonitor.org/masked-agents-smash-window-detain-engineer-portland/; Google Maps, https://www.google.com/maps/place/Top+of+the+Old+Port+Parking/@43.6604492,-70.2558152,17z/data=!3m1!4b1!4m6!3m5!1s0x4cb29c6ba7f9b061:0x4b8c273a7df55e21!8m2!3d43.6604492!4d-70.2558152!16s%2Fg%2F11c380yq15?entry=ttu&g_ep=EgoyMDI2MDcxNS4wIKXMDSoASAFQAw%3D%3D ("Google Maps Parking Lot"); Google Maps Port Terminal.[6]

Officers Angulo, Ravencamp, and Thompson were driving an unmarked vehicle and wearing police vests. FAC ¶¶ 43-44. The complaint alleges that when they encountered Plaintiff, they were aware of his name and appearance, including his apparent Hispanic ethnicity. *See id.* ¶¶ 44, 61, 152-53. Those officers pulled over Plaintiff's vehicle. *See id*. ¶ 43-44. Thompson got out and asked Plaintiff for his paperwork, and Plaintiff showed Thompson his REAL ID through his driver's side window. *Id*. ¶¶ 45-46. Thompson asked Plaintiff to step out of the car. *Id*. ¶ 48. Plaintiff did not, and instead grabbed his phone. *Id*. ¶ 49. Thompson then broke the window of Plaintiff's vehicle to open the door. *Id*. ¶¶ 49, 51. Ravencamp allegedly pointed a taser at Plaintiff. *Id*. ¶ 52. "The agents"—it is not specified which officer did what—handcuffed Plaintiff, placed him in the back of their vehicle, and drove away. *Id*. ¶¶ 53, 63.

At about 10:00 a.m., the officers stopped in a parking lot and checked Plaintiff's immigration status online. *Id*. ¶¶ 63-65. Plaintiff allegedly claimed he had been granted a valid H-1B visa and had a copy of his Form I-94 in his wallet. *Id*. ¶ 66. Thompson purportedly saw information in a database indicating Plaintiff held a valid H-1B visa. *Id*. ¶ 68. The officers took

---

[6] The news article may be considered on a motion to dismiss because it is incorporated by reference in the complaint. *See Medina-Velázquez*, 767 F.3d at 108; *Fortuna*, 607 F. Supp. 3d at 49 n.5. The geographical locations referenced herein may be considered because they are widely known in the jurisdiction and not subject to reasonable dispute. *See Wilke*, 2023 U.S. Dist. LEXIS 165978 at *17; *Peavy-Wright*, 424 F. Supp. 3d at 141 n.1.

Plaintiff's wallet, office key cards, and watch, but allegedly did not review a copy of his Form I-94. *Id*. ¶ 69. The officers told Plaintiff they were taking him to an ICE facility, that his visa would be revoked, and that he would appear before an immigration judge. *Id*. ¶¶ 70-71. The officers transferred Plaintiff to an unmarked van operated by other non-party officers, who drove Plaintiff and others to Gray, then Biddeford, and then Kittery, Maine. *Id*. ¶¶ 75-82.

In the parking lot of the Kittery Police Station, unspecified persons placed Plaintiff in a van driven by Officer Peters with Officer Stalnik riding along, and they drove Plaintiff to Portland. *Id*. ¶ 89. Peters and Stalnik drove him around Portland and then to Biddeford, where they transferred him to a bus in the afternoon. *See id*. ¶¶ 89-93. Over the next few hours, other officers—not Peters and Stalnik—transported Plaintiff to an ICE facility in Burlington, where he arrived that evening and was placed in a cell. *See id*. ¶¶ 94-96, 102-06. About 30 minutes later, an officer told Plaintiff he was free to go. *Id*. ¶¶ 107-08. Plaintiff was released and returned home. *Id*. ¶¶ 110-12.

## II. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, a complaint must "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though "detailed factual allegations" are not required, the complaint must offer "more than labels and conclusions" to provide "grounds" of "entitle[ment] to relief." *Twombly*, 550 U.S. at 555. Legal conclusions in the complaint are not accepted as true. *Iqbal*, 556 U.S. at 678. Allegations "consistent with" illegal conduct are insufficient when they are "more likely" explained by legal conduct, *id.* at 680, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. "The relevant question for a district court in assessing plausibility is not whether the

complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed *in toto* to render entitlement to relief plausible.'" *Rodríquez-Reyes v. Molina-Rodríquez*, 711 F.3d 49, 55 (1st Cir. 2023) (quoting *Twombly*, 550 U.S. at 569 n.14).

## III. ARGUMENT

Plaintiff's claims should be dismissed. This case clearly presents a new context and there are numerous rational reasons for the Court to hesitate before implying a damages remedy here. Regardless, the Individual Defendants are entitled to qualified immunity.

### A. A *Bivens* Remedy Is Not Available.

Creating new implied causes of action for damages under *Bivens* is now a "'disfavored'" activity. *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 121 (2017)). In *Bivens*, the Supreme Court created a cause of action against federal narcotics agents who allegedly manacled the plaintiff, threatened his family, and searched his home without a warrant. *See Bivens*, 403 U.S. at 397. After *Bivens*, the Supreme Court created two additional causes of action for constitutional claims: one for a Fifth Amendment equal protection claim brought by a former congressional staffer, *see Davis v. Passman*, 442 U.S. 228 (1979), and one for an Eighth Amendment inadequate medical care claim brought by a prisoner's estate, *see Carlson v. Green*, 446 U.S. 14 (1980). Before reaching the merits of any purported *Bivens* claim, courts must first determine whether a damages remedy should be implied at all. The answer here, as in most cases, is no. *See id.* at 486.

To determine whether a *Bivens* remedy is available, a court must first ask if the claim "presents 'a new *Bivens* context'" that is "'meaningfully' different from the three cases in which the [Supreme] Court has implied a damages action." *Id.* at 492 (quoting *Abbasi*, 582 U.S. at 139-40). Next, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh

the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Abbasi*, 582 U.S. at 136). These "steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* If there is a "rational reason" to think that the answer is yes—"as it will be in most every case—no *Bivens* action may lie." *Id.* (citation omitted). Applying this two-step inquiry, this Court should decline to extend *Bivens* to the claims alleged here.[7]

**1. Plaintiff's claims arise in a new *Bivens* context.**

The new context inquiry is "easily satisfied," *Abbasi*, 582 U.S. at 148-49, and is "broad." *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020). Mere similarities to the *Bivens-Carlson-Davis* trilogy are not enough for a claim to proceed, *Egbert*, 596 U.S. at 495, and even "small" differences can be "meaningful." *Abbasi*, 582 U.S. at 149. Indeed, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 589 U.S. at 103. In short, "[a] modest extension is still an extension." *Abbasi*, 582 U.S. at 147.

The differences between Plaintiff's claims and those in *Bivens* are numerous, meaningful, and render the context here new. First, this case involves a different category of defendants than the narcotics agents in *Bivens*. *See Hornof v. United States*, 107 F.4th 46, 65 (1st Cir. 2024) (CBP officials new category of defendant, "implicate immigration and national security concerns," and "a court is not competent 'to authorize a damages action . . . against Border Patrol agents generally'" (quoting *Egbert*, 596 U.S. at 496)); *Hernandez v. Causey*, 124 F.4th 325, 333

[7] Notably, Plaintiff admits that relief under *Bivens* has been "sharply limited," is "disfavored," and is "rarely if ever" available. FAC ¶¶ 123-25. Plaintiff concedes that his "equal protection claim that federal agents targeted him for arrest based on his apparent ethnicity—cannot be pursued as *Bivens* claims." *Id.* ¶ 125. Plaintiff is correct, as any alleged *Bivens* equal protection claim arises in a new context where special factors counsel hesitation. Thus, to the extent one is alleged, a *Bivens* equal protection claim must be dismissed.

(5th Cir. 2024) (finding ICE agent new category of defendant); *Tun Cos v. Perrotte*, 922 F.3d 514, 524-25 (4th Cir. 2019) (same). Second, the Individual Defendants operated under a different legal mandate—immigration and enforcement laws, like the Immigration and Nationality Act—than the agents in *Bivens*. *See* 8 U.S.C. § 1357, 8 C.F.R. § 287; *see also Sheikh v. U.S. Dep't of Homeland Sec.*, 106 F.4th 918, 925 (9th Cir. 2024) (holding HSI agents act under different legal mandate than agents in *Bivens*). Third, this case involves different kinds of Fourth Amendment violations, as the alleged law enforcement actions here "differ entirely from those at issue in *Bivens*." *Quinones-Pimentel v. Cannon*, 85 F.4th 63, 71 (1st Cir. 2023). The circumstances surrounding Plaintiff's detention bear no similarity to those in *Bivens*, which involved a warrantless search of the plaintiff's home. *See Bivens*, 403 U.S. at 389–90. In contrast, Plaintiff here was allegedly stopped in his car on a public street, detained, and transported elsewhere for a few hours. *See* FAC ¶¶ 3-5, 10, 63-71, 88-93; *see also González v. Vélez*, 864 F.3d 45, 53 (1st Cir. 207) ("*Bivens* involved the illegal search of an individual's home—an issue foreign to this case."). This alone is sufficient to establish a new context here.

In addition, that Plaintiff's claims arise from immigration enforcement makes this a new context as well. The Supreme Court rejected Fourth Amendment claims in the immigration enforcement setting in *Egbert*, 596 U.S. at 495, finding that border and national security implications made the otherwise "conventional" excessive force claim against the border patrol agent a new context. Consistent with that holding, circuits faced with requests to expand *Bivens* into the border and immigration contexts have repeatedly declined to do so.[8]

---

[8] *See Causey*, 124, F.4th at 333; *Enriquez-Perdomo v. Newman*, 149 F.4th 623, 634 (6th Cir. 2025) (finding arrest outside of home during immigration enforcement a new context); *Tun-Cos*, 922 F.3d at 524 (detention, home invasion, and traffic stop during immigration enforcement presented new context); *Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1208 (11th Cir. 2016) (no *Bivens* remedy in immigration context and holding that "a plaintiff cannot recover damages under Bivens for constitutional violations that caused him to endure a prolonged immigration detention"); *De La Paz v. Coy,* 786 F.3d 367, 375 (5th Cir. 2015) (declining to extend *Bivens* remedy to

The First Circuit has recognized that "[t]he Supreme Court has warned lower courts to act with utmost hesitation when faced with actions that do not fall *precisely* under *Bivens*, *Davis*, or *Carlson*." *Waltermeyer v. Hazlewood*, 136 F.4th 361, 368 (1st Cir. 2025) (internal quotations and citation omitted, emphasis added). Plaintiff's claims clearly do not "fall precisely" under *Bivens.* Accordingly, his *Bivens* claims arise in a new context. The Court therefore must consider whether special factors counsel hesitation. *See Abbasi*, 582 U.S. at 140.

**2. Special factors counsel against a *Bivens* remedy.**

Special factors undoubtedly counsel hesitation here. The second step of the *Bivens* inquiry focuses on whether "there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Abbasi*, 582 U.S. at 136). If there is "*any* rational reason (even one) to think that *Congress* is better suited" for that task, no *Bivens* action may lie. *Id.* at 496. Thus, a single special factor forecloses the creation of a *Bivens* remedy. At least four special factors exist here.

First, separation-of-powers concerns and systemwide consequences counsel against creating a *Bivens* remedy in this new context. As a general matter, "it is a significant step under separation-of-powers principles" for a court to create and enforce a cause of action for damages against federal officials. *Abbasi*, 582 U.S. at 133; *see also Egbert*, 596 U.S. at 491 (explaining that "creating a cause of action is a legislative endeavor" involving "a range of policy considerations" that "Congress is far more competent than the Judiciary to weigh"). Thus, when a party seeks to assert an implied cause of action, separation-of-powers principles are "central to the analysis." *Abbasi*, 582 U.S. at 135.

---

civil immigration apprehension and detentions); *Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2012) (holding *Bivens* remedy inappropriate in immigration context).

Here, Plaintiff's claims implicate the separation of powers. Immigration is the purview of Congress and the Executive Branch. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Egbert*, 596 U.S. at 494. "The Constitution gives Congress the power to 'establish a uniform Rule of Naturalization.' U.S. Const., art. I, § 8, cl. 4. . . . [and] the Executive Branch[] 'inherent power as sovereign to control and conduct relations with foreign nations.'" *De La Paz*, 786 F.3d at 379 (citing *Arizona v. United States*, 567 U.S. 387, 394–95 (2012)). The Court should not interfere with that power by recognizing a *Bivens* remedy here.

Second, implying the remedy Plaintiff seeks requires assessing a range of "policy considerations . . . at least as broad as . . . a legislature would consider," including "economic and governmental concerns," "administrative costs," and the "impact on governmental operations." *Egbert*, 596 U.S. at 486, 491. But "Congress is 'far more competent than the Judiciary' to weigh such policy considerations." *Id.* (citations omitted). Extending a remedy in a case like this may lead to massive amounts of litigation against individual ICE officers. It may also chill ICE recruitment and operations and deter agents from investigating illegal immigration and enforcing the immigration laws. S*ee id.*, 596 U.S. at 499 ("Recognizing any new *Bivens* action entails substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." (brackets and internal quotation marks omitted)). "The point is the reasonable fear that a general *Bivens* cure would be worse than the disease." *Alvarez*, 818 F.3d at 1211 (citation omitted).

Third, alternative remedial measures preclude a remedy here. Courts may "not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Egbert*, 596, U.S. at 493 (quoting *Abbasi*, 582 U.S. at 137). DHS,

of which ICE is a component agency, has an internal grievance procedure to investigate improper conduct. DHS is required to "investigate[] expeditiously" any "[a]lleged violations of the standards for enforcement activities" reported by "[a]ny persons wishing to lodge a complaint." 8 C.F.R. § 287.10; *Egbert*, 596 U.S. at 497. Individuals can submit complaints to DHS' Office of Inspector General or to ICE's Tip Form.[9] Further, Congress authorized the Secretary of DHS to investigate "noncriminal allegations of misconduct" and "impose disciplinary action on any employee of U.S. Immigration and Customs Enforcement," in circumstances not subject to investigation by the Inspector General. 6 U.S.C. §§ 253-254. The Department of Justice also offers an internal grievance process and offices to investigate alleged civil rights abuses.[10] The existence of such grievance processes is sufficient to foreclose the extension of a *Bivens* remedy. *Egbert*, 596 U.S. at 498 ("So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy.").

In addition, a damages claim against the United States under the Federal Tort Claims Act is another potential alternative avenue for relief that forecloses a *Bivens* remedy.[11] "If there are alternative remedial structures in place, 'that alone,' like any special actor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Id.* at 493 (quoting

[9] *See* https://www.ice.gov/webform/ice-tip-form.

[10] Violation of Civil Rights or Civil Liberties Complaint, U.S. Department of Justice Office of the Inspector General, https://oig.justice.gov/hotline/civil_rights_complaints; 5 U.S.C. app. § 8E note (Review of Civil Rights Complaints by the Department of Justice).

[11] While the Supreme Court in 1980 noted the FTCA standing alone did not displace a *Bivens* action for the denial of medical care to a federal inmate, *see Carlson*, 446 U.S. at 23, the Court has more recently stated that state tort law may be an "alternative means for relief" counselling against implying a remedy, *Abbasi*, 582 U.S. at 137. Thus, since *Abbasi*, many courts have noted the potential of FTCA relief as a factor weighing against a *Bivens* extension. *Corr. Servs. Corp. v. Malesko,* 534 U.S. at 61, 73-74 (2001); *Minneci v. Pollard*, 565 U.S. 118, 127-30 (2012); *Edwards v. Gizzi*, 107 F.4th 81, 86 & n.5 (2d Cir. 2024) (Park, J., concurring in judgment) (collecting cases); *Wimberly v. Selent*, No. 23-13550, 2024 WL 2845476, at *4 (11th Cir. June 5, 2024); *K.O. by & through E.O. v. Sessions*, 41 F.4th 664, 665 (D.C. Cir. 2022) (Silberman, J. concurring).

*Abbasi*, 582 U.S. at 137). It "does [not] matter that 'existing remedies do not provide complete relief.'" *Id.*; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. at 61, 69 (2001) ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers forclose[] judicial imposition of a new substantive liability."). Plaintiff has multiple alternative remedial processes through which to raise any complaints, counselling hesitation here. In short, Plaintiff's *Bivens* claims arise in a new context and must be dismissed because special factors counsel hesitation.

**B. Qualified Immunity Bars Plaintiff's Claims.**

Because there is no individual cause of action against the Individual Defendants, the Court need not address any other defenses available to them. *See Hernandez v. Mesa*,, 582 U.S. 548, 553 (2017) (noting *Bivens* question is "antecedent" to qualified immunity question). Regardless, the Individual Defendants are also entitled to qualified immunity.

Qualified immunity protects individual defendants from a claim lacking allegations of their personal participation in a constitutional violation because, in a *Bivens* action, "each Government official . . . is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677-78. "[V]icarious liability is inapplicable to *Bivens*" suits. *Id.* at 676. Accordingly, to survive a motion to dismiss, a plaintiff "must plead that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (emphasis added). Because *Bivens* imposes personal liability, it is critical, "'especially in lawsuits involving multiple defendants,' . . . that plaintiffs 'make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations.'" *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013).

Here, after Officers Angulo, Ravencamp, and Thompson allegedly turned Plaintiff over to a different set of officers in a parking lot, *see* FAC ¶¶ 75-76, those three officers had no

alleged involvement in any of the subsequent events about which Plaintiff complains, *see* FAC ¶¶ 76-112. Moreover, the complaint's generic allegations that the "agents" in Ravencamp's vehicle handcuffed Plaintiff, shackled him, took his property, and made certain statements, without any specification of who did what, *see* FAC ¶¶ 4-6, 53, 56-62, 65, 69-75, fail to plead how Angulo, Ravencamp, or Thompson each, through their own actions, committed the violations alleged against these officers. *See Kelley v. DiPaola,*, 379 F. Supp. 2d 96, 101 (D. Mass. 2005); *McKinney v. Maine State Police*, No. 2:25-CV-00370-SDN, 2025 WL 225188, at *3 (D. Me. Nov. 17, 2025).

Similarly, Officers Peters and Stalnik did not allegedly participate in the initial stop and transportation of Plaintiff, *see* FAC ¶¶ 41-87, and cannot be held liable for those events. Furthermore, like their co-defendants, Peters and Stalnik had no alleged participation in non-party officers' continued detention and transportation of Plaintiff after Peters and Stalnik left him in Biddeford. *See* FAC ¶¶ 94-112. Beyond that, Plaintiff's generic conclusory assertions that unspecified "federal agents" or "defendants" were "expressly instructed" to release him, *see* FAC ¶¶ 161, 184, are not entitled to the presumption of truth and fail to show that the Individual Defendants personally participated in a violation of his rights. *See Iqbal*, 556 U.S. at 679.[12]

For the remaining well-pled factual allegations against them, the Individual Defendants are entitled to qualified immunity. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court has established a two-prong analysis for resolving qualified immunity claims. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).

---

[12] Plaintiff alleges that, when he peaked at a group chat with a non-party officer, a message from an unspecified sender "ask[ed] about Juan Carvajal's location," and that upon Plaintiff identifying himself, the non-party officer said, "We have good news, someone is coming for you." FAC ¶¶ 84-87. But Plaintiff does not allege that any of that information was conveyed to the Individual Defendants.

The first prong requires the Court to decide whether the facts the plaintiff has alleged state a violation of a constitutional right. *See id.* at 201. The second prong requires the Court to consider whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (internal citation and quotation marks omitted). To surmount the "clearly established" threshold, "a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and brackets omitted). "[G]eneral statements of the law" are usually "incapable of giving fair and clear warning to officers," *Kisela v. Hughes*, 584 U.S. 100, 105 (2018), which is why the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high a level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Specificity is "important in the Fourth Amendment context," where "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Kisela*, 584 U.S. at 104. It "must be undertaken in light of the case's specific context, not as a broad general proposition." *Katz*, 533 U.S. at 194. Here, no matter which prong the Court addresses first, Plaintiff cannot meet his burden.

**1. Plaintiff has failed to meet his burden on qualified immunity.**

"If plaintiffs stumble at either step [of qualified immunity] . . . their . . . claims go kaput." *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 214-15 (1st Cir. 2015). Plaintiff's burden to show the existence of the relevant clearly established law is "'a heavy burden indeed.'" *Estate of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (quoting *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021)). Plaintiff "must identity either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm" and must "show that an objectively reasonable officer would have known that his conduct violated the law." *Id.* (internal quotations and citations omitted).

Plaintiff provides no case law demonstrating that any alleged right at issue was clearly established. *See* FAC ¶¶ 127-86. Plaintiff therefore has failed to meet his burden. The three primary cases that Plaintiff cites are for general propositions of law—which cannot be enough for the clearly established prong of immunity. *See, e.g.*, *Kisela*, 584 U.S. at 104-05. *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), is a factually distinguishable case involving a highway stop based solely on the plaintiff's ethnicity and outside the context of a mass immigration enforcement operation in a sanctuary jurisdiction. *See id.* at 874-75. Additionally, unlike the allegations in that case, Plaintiff's allegations for the stop are vague and conclusory as to what actions each individual officer took and the extent of their knowledge, or lack thereof, of Plaintiff's immigration status and background, and thus Plaintiff's allegations are not enough to overcome immunity. *See Iqbal*, 556 U.S. at 676-77. As for *Morales v. Chadbourne*, the First Circuit did not have appellate jurisdiction to address the question of whether an officer had probable cause for an immigration detainer of a naturalized U.S. citizen or whether relying "in part" on foreign birth violated the Fifth Amendment. 793 F.3d 208, 219-20 (1st Cir. 2015).

*Rodriguez v. United States*, 575 U.S. 348 (2015), where an officer impermissibly conducted a dog sniff of a vehicle after he had already confirmed his suspicion of a traffic violation and issued a ticket, is a far cry from the immigration-related detention here and cannot clearly establish the specific right asserted in this case. *See* 575 U.S. at 350-58. Thus, Plaintiff has failed to meet his burden to show the existence of a clearly established right that the Individual Defendants allegedly violated. *See Rahim*, 51 F.4th at 412-13.

Moreover, in the evolving legal landscape of immigration enforcement, the supposed unconstitutionality of the stop and detention here was not "beyond debate," *Wesby*, 583 U.S. at 63 (internal quotation marks and citations omitted), especially since the alleged facts indicate the Individual Defendants lawfully stopped and detained Plaintiff on suspicion of immigration violations and crimes. In that regard, a substantial volume of immigration occurred in Portland, which had sanctuary policies likely to draw to the city people unlawfully in the country, and the United States had made a finding, corroborated by successful arrests of illegal immigrants with criminal records, that illegal immigration and criminality in Maine warranted a mass enforcement operation. In that context, Plaintiff's ethnicity, name, and proximity to a port where a significant volume of foreign individuals may try to enter and remain in the country unlawfully gave Officers Angulo, Ravencamp, and Thompson reason to believe that he may be in the country unlawfully. Consequently, Angulo, Ravencamp, and Thompson had reasonable suspicion that Plaintiff was in the country illegally and properly stopped him for questioning about his immigration status. *See Noem v. Perdomo*, __U.S.___, 146 S. Ct. 1, 1-3 (2025) (Kavanaugh, J., concurring); *see also Brignoni-Ponce*, 422 U.S. at 883-85 (recognizing proximity to border or similar areas with high levels of immigration as factor supporting reasonable suspicion); *United States v. Bautista-Silva*, 567 F.3d 1266, 1271-74 (11th Cir. 2009)

(traffic stop lawful based on factors that included, *inter alia*, vehicle's travel in area known for illegal immigration, and occupants' ethnicity).

Those officers' suspicions escalated from there. Officer Thompson asked Plaintiff for paperwork, but Plaintiff produced only a REAL ID, not immigration papers. *See* FAC ¶¶ 45-46.[13] Thompson therefore reasonably asked Plaintiff to step out. *See id.* ¶ 48; *cf. United States v. Kitts*, 742 F. Supp. 1218, 1221-22 (W.D.N.Y. 1990) (reasonable suspicion based on foreign origin and lack of documentation of current valid immigration status). But Plaintiff did not comply, instead grabbing an object (that turned out to be a cellphone). *See* FAC ¶ 49. Because Plaintiff defied Thompson's order and grabbed an object during a rapidly evolving traffic stop, Thompson and his colleagues had reason to believe Plaintiff would continue to disobey Thompson's order. *Cf. Manis v. Lawson*, 585 F.3d 839, 842-45 (5th Cir. 2009) (where suspect refused orders to stop reaching under seat and instead appeared to have taken an object from there, officer reasonably believed he might be armed).

Based on this defiance, Angulo, Ravencamp, and Thompson had probable cause to believe Plaintiff was obstructing a federal officer in the performance of his duties, endangering their safety, and resisting a lawful order based on a desire to avoid detention for immigration violations. Thus, Thompson acted reasonably to gain access to Plaintiff and to attempt to remove him from the car to end the threat, and Ravencamp reasonably pointed a taser at Plaintiff to deter him from further defiance of orders and threats to officer safety. *See id.* ¶ 52; *Buchanan v.*

---

[13] A REAL ID card's validity does not outlast the revocation of a person's authorization to remain in the country. *See* U.S. Transportation Security Administration, *REAL ID Frequently Asked Questions*, available at https://www.tsa.gov/realid/realid-faqs; *see also Gent*, 611 F.3d at 84 n.5 (government website is subject to judicial notice). Thus, where a person's visa has been revoked prior to the expiration date listed on a REAL ID card, the card does not establish lawful authorization to remain in the country. Moreover, because state laws on REAL ID eligibility vary, the United States has taken the position that a REAL ID card does not establish a person's lawful presence. *See Venegas v. Homan, et al.*, Case No. 1:25-cv-00397 (S.D. Ala. 2026), ECF No. 44-1 ¶ 16 (declaration of Philip Lavoie, ASAC of ICE Mobile, Alabama, office, explaining REAL ID cards cannot reliably demonstrate citizenship).

*Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him."). Thereafter, the officers properly detained Plaintiff on suspicion of resistance to lawful police orders and violation of federal immigration laws. *See* FAC ¶¶ 53, 64; 18 U.S.C. § 111(a)(1); *see generally United States v. Ochoa*, 2008 U.S. Dist. LEXIS 142262, at *32 (N.D. Ga. Aug. 7, 2008). Accordingly, they did not violate the Fourth Amendment.[14]

Similarly, Plaintiff has not placed beyond debate the supposed unlawfulness of Officers Peters's and Stalnik's transport of Plaintiff around Portland and Biddeford. Peters and Stalnik, who had no reason to doubt the legality of other officers' initial traffic stop, detention, and transfer of Plaintiff, reasonably relied on their fellow officers' apparent finding of probable cause when they received him and took him to Biddeford pending his transfer to an immigration detention facility. *See Riley v. Alford*, 2011 U.S. Dist. LEXIS 12538, at *16-17 (D.N.H. Feb. 8, 2011). And regardless of the meaning of Peters's and Stalnik's alleged question about where Plaintiff would like to be dropped off, *see* FAC ¶¶ 89-91, Plaintiff points to no case law clearly establishing that the Constitution forbids an officer to offer a detainee a supposed false hope of release or to make an alleged joke about release at his expense. Consequently, Officers Peters and Stalnik did not violate the Fourth Amendment.

Because Plaintiff has not alleged that the Individual Defendants personally violated a right clearly established such that no reasonable official could have believed the actions were proper in the circumstances, Plaintiff cannot overcome their entitlement to qualified immunity.

---

[14] Plaintiff's Maine Civil Rights Act Claims have been dismissed against the Individual Defendants pursuant to the United States' Westfall Act substitution. As the United States explains in its motion to dismiss, substitution is proper. *See* United States' Motion to Dismiss at 4-11. Even absent substitution, the officers' qualified immunity extends to Plaintiff's equal protection claims under the Maine Civil Rights Act against Angulo, Ravencamp, and Thompson because the complaint does not allege facts showing that the officers had a discriminatory motive for the stop or treated him less favorably than a similarly situated suspect of a different race. *See Pataud v. United States Citizenship & Immigration Servs*., 501 F. Supp. 3d 22, 28-29 (D. Mass. 2020).

## IV. CONCLUSION

For the foregoing reasons, the Court should grant this Motion and dismiss the complaint against the Individual Defendants.

Dated: September 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General,
Torts Branch

PAUL E. WERNER
Assistant Director, Torts Branch

*/s/ John B. F. Martin*
JOHN B. F. MARTIN
Senior Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 616-4492
Email: john.b.martin@usdoj.gov

ANNA-DRAKE STEPHENS
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 255-7805
Email: anna-drake.stephens@usdoj.gov
*Counsel for Defendant Ravencamp, Thompson, Angulo, Peters and Stalnik*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, I electronically filed the foregoing using the CM/EFT system, which will send an electronic notification of such filing to all counsel of record.

*/s/ John B. F. Martin*

JOHN B. F. MARTIN
Senior Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 616-4492
Email: john.b.martin@usdoj.gov

*Counsel for Defendant Ravencamp, Thompson, Angulo, Peters and Stalnik*