UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JUAN SEBASTIÁN CARVAJAL-MUÑOZ,<br><br>Plaintiff,<br><br>v.<br><br>JACK CORY RAVENCAMP, *et al.*,<br><br>Defendants. | Civil No. 2:26-cv-00190-LEW |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ..........1

BACKGROUND..........1

LEGAL STANDARD..........3

ARGUMENT..........4

I. Sebastián has plausibly alleged MCRA claims against Defendants for their violations of the Fourth and Fifth Amendments to the U.S. Constitution..........4

II. Defendants are not entitled to qualified immunity from Sebastián's MCRA claims...4

A. The five named Defendants bear shared constitutional responsibility for their joint participation in the unlawful stop, arrest, excessive force, and prolonged detention..........5

B. The Arresting Agents violated clearly established Fourth and Fifth Amendment law when they stopped Sebastián based on his apparent race or ethnicity..........7

C. The Arresting Agents violated clearly established law when they arrested Sebastián without probable cause..........11

D. The Arresting Agents violated clearly established law when they subjected Sebastián to excessive force..........13

E. Both the Arresting Agents and the Detaining Agents violated clearly established law when they unreasonably prolonged Sebastián's detention. ..........16

III. Sebastián has plausibly alleged *Bivens* claims against the individual Defendants and they are not entitled to qualified immunity on these claims..........18

CONCLUSION..........20

## INTRODUCTION

On his drive to work in downtown Portland on a January morning, Juan Sebastián Carvajal-Muñoz ("Sebastián")—a civil engineer lawfully in the United States—was stopped by armed ICE agents for no reason other than his apparent race and ethnicity. *See* Am. Compl., ECF No. 33 ("Compl."). They bashed in his car window, dragged him out of the car, shackled him, and detained him for twelve hours, even after confirming his lawful immigration status. Defendants' suspicionless stop, warrantless arrest, excessive force, and prolonged detention of Sebastián violated his clearly established rights under the Fourth and Fifth Amendments. He should be permitted to proceed with his Maine Civil Rights Act ("MCRA") and *Bivens* claims against Defendants for their violations of the U.S. Constitution.

## BACKGROUND

Sebastián moved to Maine from Colombia on a student visa to earn his master's degree in civil engineering at the University of Maine. Compl. ¶ 2. After completing his education, Sebastián was invited to stay in the United States under the H-1B visa program, which permits noncitizens to work legally in the United States if they can "perform services of exceptional merit and ability." *Id.* Sebastián accepted a job in Maine as a civil engineer, specializing in soil and foundation analyses for bridge construction and repair. *Id.* ¶¶ 2, 38.

On January 20, 2026, DHS launched "Operation Catch of the Day," a large-scale immigration crackdown in which DHS agents stopped individuals based on their apparent race and ethnicity—without a warrant or probable cause—and then frequently arrested them in violation of constitutional protections. *Id.* ¶¶ 19, 24–26. On January 22, ICE agents Jack Cory Ravencamp, Javaka Y. Thompson, and Daisy I. Angulo (collectively, "Arresting Agents") targeted Sebastián in a traffic stop for no reason other than his apparent race, skin color or

ethnicity. *Id.* ¶¶ 60–63. Sebastián was driving to work in Portland when an unmarked SUV boxed in Sebastián's car and the Arresting Agents surrounded the car. *Id.* ¶¶ 41, 43, 44. Agent Thompson approached the driver's side window and demanded Sebastián's paperwork. *Id.* ¶ 45. Sebastián complied, showing Agent Thompson his REAL ID—identification available only to individuals with "[e]vidence of lawful status." 6 C.F.R. § 37.11(g); *see* Compl. ¶ 47.[1]

Despite this evidence of Sebastián's lawful status, Agent Thompson told Sebastián to step out of the car. Compl. ¶ 48. Seconds later—as Sebastián reached for his phone to exercise his First Amendment right to record the incident, *see Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011)—Agent Thompson smashed his window with a crowbar, spraying shattered glass on the driver's seat and Sebastián's jacket. *Id.* ¶¶ 49–50. Agent Thompson dragged Sebastián out of the car, while Agent Ravencamp pointed a taser at him. *Id.* ¶¶ 51–52. The Arresting Agents then handcuffed Sebastián, transferred him to the back of the unmarked SUV, and drove away, leaving Sebastián's car running in the middle of the street. *Id.* ¶¶ 3, 53, 56.

After arresting Sebastián, the Arresting Agents drove around Portland for an hour before stopping at a Home Depot parking lot. *Id.* ¶¶ 63–65. Only then did they check Sebastián's immigration status online—an inquiry that confirmed he held a valid H-1B visa. *Id.* ¶¶ 66–68. Instead of releasing Sebastián, the Arresting Agents told him they were taking him to the ICE facility in Burlington, Massachusetts. *Id.* ¶ 70. They threatened that his visa would be revoked; confiscated his wallet, office card keys, and watch; and placed his feet in shackles. *Id.* ¶¶ 69–74.

After a series of transfers, *id.* ¶¶ 75-81, the van transporting Sebastián stopped at the Kittery police station, where Sebastián was given the "good news" that "someone is coming for

---

[1] Sebastián also had a copy of his Form I-94 in his wallet, showing that his H-1B visa status remains valid through September 2027. Compl. ¶¶ 66, 67. However, Defendants never requested additional information before breaking Sebastián's car window and arresting him. *See id.* ¶¶ 45–56.

you," *id*. ¶¶ 82-87. Defendants James Peters and John Stalnik (collectively, "Detaining Agents") then arrived in another van to pick up Sebastián. *Id.* ¶ 88. The Detaining Agents drove him back to Portland, asked him where he wanted to be dropped off, and drove to his requested location in Portland. *Id.* ¶¶ 89–90. But then, the Detaining Agents refused to stop in Portland and instead drove Sebastián back south, to Biddeford. *Id.* ¶¶ 90–92.

In Biddeford, the agents transferred Sebastián to a bus with other shackled detainees to be transported to the ICE facility in Burlington, Massachusetts. *Id.* ¶¶ 93–100. Sebastián and other detainees were instructed to urinate in the parking lot. *Id.* ¶ 96. After a long wait, agents drove Sebastián and the other shackled detainees to the ICE facility. *Id.* ¶¶ 98–102. Agents then locked Sebastián in a cell with dozens of other detainees. *Id.* ¶¶ 102–103. About 20 or 30 minutes later, an agent told Sebastián that he was "not supposed to be there" and was free to go. *Id.* ¶ 107–108. Sebastián took a cab to South Station and traveled back home to Portland on the Concord Coach bus, at his own expense. *Id.* ¶¶ 110–112. Sebastián did not reach Portland until around midnight, more than fifteen hours after he had been suddenly stopped and detained. *Id.* ¶ 112.

## LEGAL STANDARD

When a defendant moves to dismiss under Rule 12(b)(6), the court asks whether the plaintiff's allegations permit "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011) (citing Fed. R. Civ. P. 12(b)(6)).

## ARGUMENT

**I. Sebastián has plausibly alleged MCRA claims against Defendants for their violations of the Fourth and Fifth Amendments to the U.S. Constitution.**

The Court should deny Defendants' motion to dismiss his MCRA claims under Federal Rule of Civil Procedure 12(b)(6). *See* ECF 39 ("Mtn.") at 1. Defendants seek dismissal of the MCRA claims based on the theory that the claims were already "dismissed" when the government filed a scope-of-employment certification under the Westfall Act, 28 U.S.C. § 2679. Mtn. at 1. As discussed in Sebastián's opposition to the government's motion to dismiss for lack of jurisdiction, ECF No. 49, Sebastián's MCRA claims are brought for violations of the Fourth and Fifth Amendments to the U.S. Constitution pursuant to 28 U.S.C. § 2679(b)(2)(A). Thus, the government's scope-of-employment certification has no effect on Sebastián's MCRA claims against the Defendants and provides no basis for dismissal of those claims.

**II. Defendants are not entitled to qualified immunity from Sebastián's MCRA claims.**

Officers forfeit qualified immunity if their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up). "[T]he salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Existing precedent must have placed the legal question "beyond debate." *French v. Merrill*, 15 F.4th 116, 126 (1st Cir. 2021). "This does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but rather that in the light of pre-existing law the unlawfulness must be apparent." *Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (cleaned up). When conducting the qualified immunity analysis, "a court should use its full knowledge of its own and other relevant precedents," *id.* (cleaned up):

the governing legal principle may be dictated by "controlling authority" or "a robust consensus of . . . persuasive authority," *French*, 115 F.4th at 126 (cleaned up). Qualified immunity must also be denied if the constitutional violation is "obvious." *Taylor v. Riojas*, 592 U.S. 7, 9 (2020). Here, Defendants have forfeited qualified immunity on both bases: existing factually similar precedents show beyond debate that Defendants' conduct violated Sebastián's Fourth and Fifth Amendment rights, and in any event the violations were obvious.

**A. The five named Defendants bear shared constitutional responsibility for their joint participation in the unlawful stop, arrest, excessive force, and prolonged detention.**

Contrary to Defendants' argument that each officer's actions must be viewed in isolation, Mtn. 13-14, officers acting as "joint tortfeasors . . . may incur shared constitutional responsibility." *Martinez v. Colon*, 54 F.3d 980, 985 n.4 (1st Cir. 1995). "The joint participant basis for liability is well established" in case law interpreting 42 U.S.C. § 1983, *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 52 (1st Cir. 2005), on which the MCRA is patterned, *Doe I v. Williams*, 2013 ME 24, ¶ 72, 61 A.3d 718, 739. In accord with general tort principles concerning joint tortfeasors, when "several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (citing Restatement (Second) of Torts §§ 875, 879). Under these well-established principles, the Arresting Agents share constitutional responsibility for their joint participation in the unlawful stop, arrest, excessive force, and detention of Sebastián, Compl. ¶¶ 41–75, and the Detaining Agents share responsibility for their joint participation in Sebastián's further prolonged detention, *id.* ¶¶ 82–101.

Defendants claim they escape liability because in some instances the complaint alleges that Defendants took specific actions "without any specification of who did what." Mtn. 14. But no such pleading standard exists: "at the beginning of the case—prior to discovery and before the

plaintiff has access to . . . statements and reports from participants and witnesses regarding what each officer has done—it is impossible to imagine that a complaint involving the allegedly wrongful conduct of a number of police officers could ever contain the specificity that Defendants here say is required." *Robinson v. Farley*, 264 F. Supp. 3d 154, 160 (D.D.C. 2017). Indeed, even at the later stages of summary judgment and trial, if a plaintiff is "unable to pinpoint precisely which named defendant did what," officers can still be held liable as joint tortfeasors for any unconstitutional act committed in their presence—either because they were "personally involved" in it or because they "failed to intervene to prevent it." *Fazica v. Jordan*, 926 F.3d 283, 291, 293 (6th Cir. 2019); *Torres-Rivera*, 406 F.3d at 51–53 (recognizing joint tortfeasor liability because officers participated in or enabled the conduct, or failed to intervene).[2]

Defendants further claim they cannot be held responsible for anything that happened after they transferred Sebastián to the custody of other law enforcement agents. Mtn. 14.[3] But it is "clearly established that a law enforcement officer is responsible for the natural consequences of his actions." *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015) (cleaned up). As in *Morales*, when the Arresting Agents, and later the Detaining Agents, transferred Sebastián to the custody of other DHS agents, they understood that the "natural consequence" of their unlawful actions was Sebastián's "continued detention." *See id*.[4]

---

[2] Unlike the cases Defendants rely upon, this is not a case where the plaintiff's complaint "consist[s] largely of labels and conclusory allegations regarding his arrest," *McKinney v. Maine State Police*, 2:25-cv-00370, 2025 WL 3204188, *2 (D. Me. Nov. 17, 2025), *adopted* 2026 WL 1080358, nor is it a case where the plaintiff seeks to hold supervisors liable for the acts of their subordinates, *Kelley v. DiPaola*, 379 F. Supp. 2d 96, 101 (D. Mass. 2005).

[3] Plaintiff agrees that the Detaining Agents, Defendants Stalnik and Peters. are not liable for the unlawful acts the Arresting Agents took before Stalnik and Peters arrived on the scene: the complaint names Agents Stalnik and Peters as defendants on the counts related to the prolonged detention (Counts V and IX), but does not name them as defendants on the counts related to the initial unlawful stop and arrest (Counts I-IV and VI-VIII).

[4] Indeed, the Arresting Agents made clear that they intended extreme adverse consequences to flow from their unlawful stop and arrest: they told Sebastián they were taking him to the ICE facility in Burlington, Massachusetts and his H1-B visa would be revoked. Compl. ¶¶ 70-71.

**B. The Arresting Agents violated clearly established Fourth and Fifth Amendment law when they stopped Sebastián based on his apparent race or ethnicity.**

Defendants' argument boils down to this: Masked, armed ICE agents can stop anyone they wish in Portland, Maine, based solely on their "ethnicity, name, and proximity to a port." Mtn. 17. That flies in the face of decades of clearly established law.

Fifty years ago, the Supreme Court made clear that immigration officers "may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–86 (1975). It has long been "clearly established" that "immigration stops and arrests [a]re subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and probable cause for any further arrest and detention." *Morales*, 793 F.3d at 215. DHS's own regulations confirm that immigration officers may "briefly detain [a] person for questioning" only if they have "a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2). And the "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Fla. v. Royer*, 460 U.S. 491, 500 (1983).

Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch'": the officer must be able to point to "specific and articulable facts" that reasonably warrant the intrusion on the particular person stopped. *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968). The Fourth Amendment inquiry is *individualized*: "This demand for specificity . . . is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence." *Id.* at 21, n. 18. A set of facts cannot constitute reasonable suspicion if it "describe[s] a very large category of presumably

innocent" people. *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam); *see Brignoni-Ponce*, 422 U.S. at 886 (facts that describe "[l]arge numbers" of individuals cannot form sole basis for reasonable suspicion).

A person's apparent race or ethnicity alone does *not* provide reasonable suspicion for a stop. *Brignoni-Ponce*, 422 U.S. at 886; *see also Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force. Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity.") (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). In *Brignoni-Ponce*, immigration officers stopped a car near a port of entry on the U.S.-Mexico border because its occupants "appeared to be of Mexican descent." 422 U.S. at 885. The Court found the stop unconstitutional, holding that even by the border, the "apparent Mexican ancestry of the occupants" did not provide "reasonable grounds to believe that the three occupants were aliens." *Id.* at 882, 885–86 (acknowledging that "[r]oads near the border" carry "aliens seeking to enter the country illegally," but reasoning that "[l]arge numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens").

Defendants invoke Justice Kavanaugh's concurrence in *Noem v. Perdomo*, a recent Supreme Court emergency stay order. Mtn. 17 (citing 146 S. Ct. 1, 1–3 (2025) (Kavanaugh, J., concurring)). But "[t]he Court majority merely issued a one-paragraph order granting a stay without any explanation for its holding," so "why the Court ruled as it did remains unclear—and without reasoning, this order cannot even be considered as persuasive." *Escobar Molina v. U.S. Dep't of Homeland Security*, 811 F. Supp. 3d 1, 35–36 (D.D.C. 2025). Moreover, even if Justice

Kavanaugh's reasoning had persuasive authority (it does not), it *reaffirmed* that immigration stops based on apparent race or ethnicity alone are unlawful. *Perdomo*, 146 S. Ct. at 3. His concurrence reasoned that the Los Angeles stops were likely justified by apparent ethnicity if coupled with a variety of specific factors not present here, *id*. at 2–3, but never suggested (as Defendants urge here) that immigration officers could stop anyone based on their race or ethnicity simply because Los Angeles has a port.

The Arresting Agents had no basis to stop Sebastián other than his apparent race, skin color, or ethnicity: at the time they stopped him, the *only* information they had about him was his appearance and the fact his vehicle was registered to a Hispanic-sounding name. Compl. ¶¶ 60–62. *Brignoni* clearly established, in indistinguishable circumstances, that stopping an individual based on their race or ethnicity violated the Fourth Amendment. 422 U.S. at 885–86. Moreover, it is obvious that relying solely on race or ethnicity for criminal enforcement is unconstitutional. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."); *Flowers v. Fiore*, 359 F.3d 24, 34 (1st Cir. 2004) ("Selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment."). Qualified immunity cannot shield Defendants from either their Fourth or their Fifth Amendment violations.

Defendants point to no specific facts indicating Sebastián was here unlawfully, instead gesturing to facts that describe "a very large category of presumably innocent" people—precisely the kind of facts the Supreme Court has held cannot furnish reasonable grounds for a stop. *Reid*, 448 U.S. at 441; *see Brignoni-Ponce*, 442 U.S. at 886. *First*, Defendants contend they justifiably targeted Sebastián (and hundreds of others) in "Operation Catch of the Day" because they had labeled Portland a "sanctuary jurisdiction." Mtn. 2, 16–17. This is a shocking admission. States

have a sovereign right, under the Tenth Amendment, "to refrain from assisting with federal efforts," *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019); the federal government cannot "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Murphy v. NCAA*, 584 U.S. 453, 473 (2018) (cleaned up). A jurisdiction's exercise of its constitutional rights plainly does not justify federal law enforcement stops of all of its residents—if that were the case, federal law enforcement could conduct mass retaliatory stops of residents whenever their state makes policy choices the administration disagrees with.[5]

*Second*, Defendants say they were justified in stopping Sebastián because 11.8% of the Portland population is foreign-born, Mtn. 3, 17—but again that provides no information about how many people are present in Portland unlawfully, let alone particularized information about *Sebastián*'s status. *Third*, Defendants stress the unremarkable point that Portland has a port. Mtn. 3-5, 17. But the Fourth Amendment does not permit "random" stops in "border areas"; instead, it demands individualized reasonable suspicion, a requirement that "protects residents of the border areas from indiscriminate official interference." *Brignoni-Ponce*, 422 U.S. at 883. If Portland's geography supplied reasonable suspicion to stop Sebastián, then immigration officers would have unlimited discretion to stop anyone they wished not only in Portland, but in every city throughout the country with a port of entry. *Fourth*, Defendants speculate (without citation) that "a significant volume of foreign individuals may try to enter and remain in the country unlawfully" through Portland's port and that "illegal immigration and criminality in Maine warranted a mass enforcement operation." Mtn. 17. These factual assertions are not grounded in

[5] Defendants' "sanctuary jurisdiction" argument also fails on factual grounds. The only law Defendants cite is a state law that took effect July 29, 2026—six months after Defendants stopped Sebastián. Mtn. 2 (citing P.L. ch. 517, codified at 5 M.R.S. § 4763 (eff. July 29, 2026)).

reality, let alone grounded in Sebastián's complaint. They are precisely the kind of unsupported, "inchoate" suspicions forbidden by the Fourth Amendment. *Terry*, 392 U.S. at 27.[6]

**C. The Arresting Agents violated clearly established law when they arrested Sebastián without probable cause.**

The Arresting Agents further violated clearly established Fourth Amendment law when they escalated the initial investigatory stop into a warrantless arrest and detention without probable cause. It is "beyond debate" that immigration officers "need probable cause to arrest and detain individuals for the purpose of investigating their immigration status." *Morales*, 793 F.3d at 216–17; *see also* 8 U.S.C. § 1357(a)(2) (authorizing immigration arrests only if officer has "reason to believe" arrestee is in the United States in violation of immigration laws, among other requirements). Probable cause is an objective standard requiring specific "facts and circumstances sufficient to warrant a prudent [person] in believing" that the arrestee had committed or was committing an offense. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).

Defendants maintain they "properly detained [Sebastián] on suspicion of . . . violation of federal immigration laws." Mtn. 19. But the law is clear that arrest requires *probable cause*, not mere "suspicion." Here, the Arresting Agents lacked even reasonable suspicion that Sebastián was here unlawfully, let alone probable cause. *See supra* Section II(B). Surprisingly, Defendants assert that Sebastián's immediate offering of his REAL ID "*escalated*" their "suspicions." Mtn. 18 (emphasis added). The opposite is true: any possible suspicion for the initial stop was *dispelled* when Sebastián immediately provided his government-issued REAL ID, which is issued to non-citizens only if they have evidence of lawful status. Compl. ¶¶ 46–47; *see* 49

[6] In a footnote, Defendants conclusorily state that qualified immunity bars Sebastián's equal protection claim because he "has not allege[d] facts showing that the officers had discriminatory motive for the stop." Mtn. 19, n.14. But Defendants themselves state that they stopped Sebastián based on his "ethnicity, name, and proximity to a port." Mtn. 17. Even absent that concession, the complaint's allegations support the reasonable inference that Defendants targeted Sebastián for stop and arrest based on his race or ethnicity. Compl. ¶¶ 58-59, 61-62, 68-72, 153-54.

U.S.C. § 30301 Note;[7] *see, e.g.*, *Hussen v. Noem*, 822 F. Supp. 3d 944, 992, 994, 996 (D. Minn. 2026) (finding "compelling and troubling" evidence of immigration officers' repeated suspicionless stops and arrests without probable cause, emphasizing that any reasonable suspicion was dispelled by arrestees' proffered documentation).[8] Defendants point to no facts suggesting Sebastián's REAL ID was invalid, or any other facts that would lead a reasonable person to believe Sebastián had violated immigration laws. Indeed, Agent Thompson never requested additional information before breaking Sebastián's car window and arresting him seconds later, *see* Compl.. ¶¶ 45–56—if he had, Sebastián could have provided the Form I-94 in his wallet, showing that his H-1B visa status is valid through September 2027, *id.* ¶¶ 66, 67.

Perhaps recognizing they lacked probable cause to arrest Sebastián for immigration violations, Defendants now claim they "properly detained [Sebastián] on suspicion of resistance to lawful police orders" in violation of 18 U.S.C. § 111(a)(1). Mtn. 19.[9] Defendants provide no explanation for this far-fetched claim—which would require that at the time of the arrest, the Arresting Agents had probable cause to believe that Sebastián "*forcibly* . . . resist[ed]" them through either "physical contact with the federal agent," or "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death," and would further require proof of "an assault, or a similar act of resisting, opposing, or impeding an officer."

---

[7] *See* 49 U.S.C. § 30301 Note (incorporating Pub. L. 109-13, Div. B, Title II, § 202, as amended, including the requirement for states to require "[e]vidence of lawful status" before issuing a REAL ID); 6 C.F.R. § 37.11(g).

[8] Defendants assert that the United States has "taken the position that a REAL ID card does not establish a person's lawful presence"—but they rely solely on a declaration from an ICE official in Alabama, and it merely states that REAL ID cards cannot reliably establish "*citizenship*." Mtn. 18, n.13 (emphasis added). Defendants also assert that a REAL ID's validity "does not outlast the revocation of a person's authorization to remain," *id.*, but point to no basis for the Arresting Agents to believe that Sebastián's status had been revoked.

[9] Defendants' accusation fits into a familiar pattern: a recent New York Times investigation found that the federal government has filed hundreds of meritless criminal cases alleging that people violated 18 U.S.C. § 111 while interacting with federal immigration agents. Mike McIntire, Danny Hakim, Alexandra Berzon, Jazmine Ulloa, and Lauren McCarthy, *They Were Charged With Assaulting ICE Agents. The Cases Are Crumbling*, NY Times (July 18, 2026), https://www.nytimes.com/2026/07/18/us/ice-assaults-protesters.html; *see also Peck v. United States*, 2:26-cv-00293-JAW (D. Me.), ECF 6 (Amended Complaint), ¶¶ 165-170 (alleging that on January 22, 2026, DHS agents accused South Portland man of violating Section 111 without any reasonable basis).

*United States v. Taylor*, 848 F.3d 476, 493 (1st Cir. 2017) (cleaned up and emphasis added). Section 111(a)(1) is narrowly drawn: it "is not meant to sweep in all harassment of Government officials," "'nor is it used to penalize frustrating an official, without more, even if that action is deliberate.'" *United States v. Johnson*, 462 F.2d 423, 428 (3d Cir. 1972). Underscoring the importance of "forcible" as an element of this crime, a Texas district court recently dismissed a Section 111(a) charge as "egregious[]" and "unsupported by the text of 18 U.S.C. § 111(a)," where the non-citizen refused to open his window, used his cellphone, and then passively resisted by moving his truck between DHS vehicles. *United States v. Quintanilla-Chavez*, 807 F. Supp. 3d 641, 667, 669–70 (W.D. Tex. 2025).

Defendants point to no facts in the complaint suggesting any resistance by Sebastián, let alone "forcible" resistance similar to an assault. His mere act of reaching for his phone to record the incident did not resist the arrest in any way, let alone forcibly. Indeed, just "[s]econds" after he reached for his phone, Defendants bashed in his window with a crowbar, forced open his door, and dragged him out. Compl. ¶¶ 49-51.[10] In short, Defendants arrested Sebastián without probable cause of any violation of immigration or criminal law—in violation of clearly established Fourth Amendment law.

### D. The Arresting Agents violated clearly established law when they subjected Sebastián to excessive force.

The law has long been clear that use of excessive force in carrying out an arrest violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Whether the force used is reasonable turns on factors "including the severity of the crime at issue, whether the

[10] Defendants rely on an unreported Georgia district court decision, *see* Mtn. 19, but that decision was vacated and remanded on appeal, and in any event the court there found a Section 111(a)(1) charge supported where the suspect possessed a firearm and made "threatening moves to his waistband." *United States v. Ochoa*, No. 1:08-CR-069, 2008 WL 11449144, at *10 (N.D. Ga. Aug. 7, 2008), *vacated and remanded*, 353 F. App'x 390 (11th Cir. 2009).

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. And under DHS's own regulations, immigration officers must "always use the minimum non-deadly force necessary to accomplish the officer's mission." 8 C.F.R. § 287.8(a)(iii).

All three *Graham* factors weigh heavily in favor of finding that the Arresting Agents used excessive force. The Arresting Agents had no reasonable suspicion or probable cause of any immigration violation or criminal offense. *See supra* Section II(B), (C). Even if they did, the alleged offense of unlawful presence is a *civil*, not criminal, offense, *Arizona v United States*, 567 U.S. 387, 407 (2012), and poses even less public safety threat than many "minor" offenses like speeding or driving while intoxicated. *Quintanilla-Chavez*, 807 F. Supp. 3d at 664. Moreover, nothing about Sebastián's behavior suggested any safety threat or flight risk. Under these circumstances, the Arresting Agents' use of force was plainly excessive. After cutting off Sebastián's vehicle, the three armed officers surrounded his car. Compl. ¶¶ 43–44. Agent Thompson smashed his driver's side window with a crowbar, spraying shards of shattered glass everywhere including in Sebastián's jacket; Agent Thompson forced Sebastián's door open and dragged him out, while Agent Ravencamp pointed a taser at Sebastián. *Id.* ¶¶ 50–52. The Arresting Agents handcuffed Sebastián and later placed his feet in shackles, leaving his ankles and wrists painful and sore. *Id.* ¶¶ 53, 74, 114. Even after confirming his valid H1-B visa, they threatened his visa would be revoked. *Id.* ¶¶ 68–71.

Moreover, it was clearly established that the Arresting Agents' violent and intimidating conduct toward Sebastián was unconstitutionally excessive. In the First Circuit, the law is clear that when the supposed offense is minor and the suspect poses no safety threat or flight risk, only "minimal force" is reasonable to effectuate an arrest. In *Alexis v. McDonald's Restaurants of*

*Mass., Inc.*, 67 F.3d 341, 353 (1st Cir. 1995), the First Circuit held that the circumstances "plainly counseled minimal force in effecting any arrest," given that the suspect's alleged offense was a misdemeanor (criminal trespass), she posed no safety threat, and she did not attempt to evade arrest. Thus, police officers used excessive force when they pulled the suspect from a restaurant booth and across the table, handcuffed her, and dragged her to a police cruiser and pushed her inside. *Id*. (citing cases finding excessive force based on "dragging" and tightly handcuffing arrestee); *see also Morelli v. Webster*, 552 F.3d 12, 16, 23 (1st Cir. 2009) (holding that where suspect was "an unresisting woman who, at worst, was suspected of being a petty thief," it was "crystal clear" that a police officer's acts of grabbing her wrist, yanking her, and pinning her against a wall to detain her were excessive); *Ciolino v. Gikas*, 861 F.3d 296, 298–99, 303–04 (1st Cir. 2017) (concluding that officers used excessive force in violation of clearly established law by grabbing suspect and dragging him backward to pavement, after suspect taunted K-9 police dogs and refused to comply with police orders); *Raiche v. Pietroski*, 623 F.3d 30, 37, 39 (1st Cir. 2010) (finding "obvious" Fourth Amendment violation where suspect was accused of "relatively minor" civil violations for failing to wear motorcycle helmet and stop when signaled by police, and yet officers removed him from parked motorcycle and slammed him onto pavement).

More specifically, courts both in and outside the First Circuit have repeatedly found that when—as here—the offense is minor and the suspect posed no threat or flight risk, officers use excessive force by breaking the suspect's car window, dragging the suspect out of the car, and tightly handcuffing the suspect. In *Shea v. Porter*, the Massachusetts district court set aside a jury verdict against arrestee on excessive force claims. 56 F. Supp. 3d 65 (D. Mass. 2014). The court held that an officer used excessive force in breaking a woman's car window with a flashlight,

dragging her out of the car, handcuffing her, and cursing at her, given that she was charged with a minor offense of speeding, was not attempting to flee, and was not an immediate threat. *Id.* at 84, 86–88. Although the degree of physical force, "standing alone, did not rise to the level that is commonly associated with claims against police officers for excessive force," the court explained that "[e]xcessive force claims may be based entirely on an undue threat of force, or placing a defendant in dangerous circumstances, even in the absence of physical contact." *Id.* at 88. And in *Quintanilla-Chavez*, the Texas district court concluded that DHS agents used excessive force when they broke a noncitizen's window, pulled him from the car, pointed firearms at him, and shoved him to the ground, after he failed to roll down his window, used his cell phone, and engaged in the "passive resistance" of moving his truck to park between law enforcement vehicles. 807 F. Supp. 3d at 650, 663, 666–67. The court observed that suspected unlawful presence presents even *less* public safety threat than many minor infractions like speeding, and found the agents' conduct "shocking" and "outrageous." *Id.* at 664, 669, 671; *see also Deville v. Marcantel*, 567 F.3d 156, 161, 167–69 (5th Cir. 2009) (denying qualified immunity when police stopped suspect for speeding and, after suspect refused to step out, "quickly resorted to breaking [suspect's] driver's side window and dragging her out of the vehicle"). The Arresting Agents' violent and threatening conduct was plainly excessive.[11]

**E. Both the Arresting Agents and the Detaining Agents violated clearly established law when they unreasonably prolonged Sebastián's detention.**

On top of the unconstitutionality of Sebastián's arrest, both the Arresting Agents and the

[11] Defendants rely on two Fifth Circuit cases in an effort to justify their use of force, Mtn. 18-19, but both are inapposite. *See Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 313–14 (5th Cir. 2013) (finding officer's tasing justified where the suspect wielded a bat, "charged" an officer "with the bat in an attempt to cause serious bodily injury," and, even after finally putting the bat down, leaned toward it as if to pick it up again); *Manis v. Lawson*, 585 F.3d 839, 844–45 (5th Cir. 2009) (finding officer's use of force justified based on officer testimony he believed suspect had retrieved a weapon, and undisputed facts showed suspect reached under the seat of his vehicle in defiance of officer commands). There are no such facts alleged in the complaint here.

Detaining Agents violated clearly established law by unnecessarily prolonging Sebastián's detention beyond the initial arrest without any lawful basis. The law is clear that even a seizure that is "lawful at its inception" becomes unreasonable if "it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Rodriguez v. United States*, 575 U.S. 348, 353, 356–58 (2015) (finding even "de minimis" eight-minute prolonging of traffic stop for dog sniff violated Fourth Amendment, absent separate reasonable suspicion of crime); *see Ramsey v. City of Pawtucket*, No. 1:17-CV-00078, 2020 WL 5821072, at *7 (D.R.I. Sept. 30, 2020) (denying officer qualified immunity based on clearly established law that stop "could not be prolonged beyond the time necessary to complete it" absent separate articulable suspicion of crime).

Not only did the Arresting Agents lack probable cause to stop and arrest Sebastián for immigration violations, but they continued to detain him for hours longer than reasonably necessary to investigate his immigration status—indeed, they prolonged his detention even after they had definitively *confirmed* he had a valid H1-B visa based on their own database. Compl. ¶¶ 63–68. Rather than releasing Sebastián, the Arresting Agents placed his feet in shackles, transferred him to the custody of other DHS agents, and told him his visa would be revoked. *Id.* ¶¶ 69–75. Sebastián remained in DHS custody until his release from the ICE facility in Massachusetts after 9 p.m. that night. *Id.* ¶¶ 5, 108–112.

The Detaining Agents likewise violated clearly established law by further unreasonably prolonging Sebastián's detention. The Detaining Agents claim they reasonably relied on their fellow officers' "apparent finding of probable cause," Mtn. 19, but that cannot save Defendants when, as here, *none* of the agents had probable cause—either individually or collectively. Defendants point to no facts indicating the Detaining Agents reasonably believed there was

probable cause to detain Sebastián; instead, the well-plead allegations indicate precisely the opposite. At around 1 p.m., Sebastián was told, "We have good news, someone is coming for you." *Id.* ¶¶ 84–87. An hour later, a van driven by the Detaining Agents arrived to pick up Sebastián (but no other detainees); the Detaining Agents then drove Sebastián back to Portland and asked where he wanted to be dropped off. *Id.* ¶¶ 88–89. But rather than dropping him off, the Detaining Agents refused to stop, only to transfer him back to a bus bound for the ICE facility in Massachusetts. *Id.* ¶¶ 90–96. The Detaining Agents unnecessarily prolonged his detention far longer than "reasonably required to complete th[e] mission." *Caballes*, 543 U.S. at 407.

In sum, Sebastián plausibly alleges that Defendants violated his clearly established rights under the U.S. Constitution. The Court should deny qualified immunity on his MCRA claims.

**III. Sebastián has plausibly alleged *Bivens* claims against the individual Defendants and they are not entitled to qualified immunity on these claims.**

Sebastián states a claim for relief under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), because this case arises in the same context as *Bivens* itself: a Fourth Amendment challenge to an unlawful warrantless arrest and use of excessive force.

*Bivens* "recognized an implied cause of action for damages against federal officers for certain alleged violations of the Fourth Amendment." *Goldey v. Fields*, 606 U.S. 942, 942 (2025) (per curiam). Although expanding *Bivens* has become "a disfavored judicial activity," *id.*, the Supreme Court has repeatedly refused to overrule *Bivens*: it remains "settled law" in the "sphere of law enforcement," where it has engendered "undoubted reliance." *Ziglar v. Abbasi*, 582 U.S. 120, 134 (2017).

A two-step inquiry governs whether a *Bivens* claim is viable: courts first ask "whether the plaintiff's claims arise in a new context compared to one of the cases in which the Court already has recognized a damages remedy under *Bivens*"; and "if the context is new, then a court must

move on to the second step" and ask "whether there are special factors counselling hesitation in extending the *Bivens* remedy." *Arias v. Herzon*, 150 F.4th 27, 30 (1st Cir. 2025) (cleaned up), *cert. petition filed*, No. 26-111 (U.S. Jul. 23, 2026). Whether a case presents a "new" context is a "functional" inquiry. *Id.* at 35. "[A] difference is meaningful if it might alter the policy balance that initially justified the causes of action recognized in *Bivens*." *Id.* (cleaned up).

Here, as in other cases presenting the same context as *Bivens*, Sebastián challenges line law enforcement officers' arrest authority and use of excessive force. *See Hicks v. Ferreyra*, 64 F.4th 156, 168 (4th Cir. 2023); *Arias*, 150 F.4th at 49–50; *Snowden v. Henning*, 72 F.4th 237, 245–46 (7th Cir. 2023). Although the Supreme Court has declined to apply the *Bivens* remedy against Border Patrol agents, *Egbert v. Boule*, 596 U.S. 482, 496 (2022), the involvement of a different agency does not always create a new context, *Hicks*, 64 F.4th at 169 (allowing *Bivens* claims against U.S. Park Police officers). Indeed, the First Circuit has previously allowed *Bivens* claims to proceed against ICE employees conducting arrests within the United States, *Morales*, 793 F.3d at 211—claims that do not categorically implicate *Egbert'*s concern about policing the nation's very borders. Enforcing the clear "judicial guidance" on warrantless arrest and excessive force inside the country involves minimal "intrusion by the Judiciary into the functioning of other branches," *Ziglar*, 582 U.S. at 140, and does "not trigger the kind of acute separation of powers concerns that made the cross-border context at issue in *Hernandez* [*v. Mesa*, 589 U.S. 93 (2020)] meaningfully different," *Arias*, 150 F.4th at 38 (cleaned up). Far from implicating heightened "national security" concerns, *see* Mtn. 8, 11 (citing *Hornof v. United States*, 107 F.4th 46, 66 (1st Cir. 2024); *Egbert*, 596 U.S. at 494), this case challenges a roadside vehicle stop inside the United States—a common activity for law enforcement officers of all types.

Any other differences from *Bivens* itself are "so trivial that they will not suffice to create

a new *Bivens* context." *Ziglar*, 582 U.S. at 149. The First Circuit has rejected Defendants' contention that a claim automatically presents a new context when it challenges an arrest in public, rather than a warrantless search and arrest in a home. *Arias*, 150 F.4th at 38 (holding that claims of excessive force "in a publicly accessible parking lot" did not present "the kind of acute separation of powers concerns" that would prompt a new *Bivens* context); *see also Hicks,* 64 F.4th at 161–62, 169 (holding that unlawful traffic stop claims against U.S. Park Police officers did not involve a new context).[12] This case similarly presents no new *Bivens* context.

As the First Circuit explained in *Arias*, "run-of-the-mill allegations of excessive force during an arrest" do not "risk[] alter[ing] the policy balance that initially justified the cause of action recognized in *Bivens*." 150 F.4th at 39–40 (cleaned up). Because this case presents no "new context," the inquiry ends at step one and Sebastián may pursue his claims under *Bivens*.

Defendants' qualified immunity defenses as to Sebastián's *Bivens* claims fail for the same reasons discussed above with respect to the MCRA claims. *See supra* Section II. Because the complaint states a claim that Defendants violated Sebastián's clearly established rights under the Fourth Amendment, Defendants are not protected by qualified immunity.

## CONCLUSION

Defendants' suspicionless stop, warrantless arrest, excessive force, and prolonged detention of Sebastián based solely on his apparent race or ethnicity violated his clearly established constitutional rights, and his *Bivens* claims present no new context. Defendants' motion to dismiss should be denied.

---

[12] Contrary to Defendants' argument, *see* Mot. 9, *González* did not limit the *Bivens* context to searches or seizures conducted in the home. *González v. Velez*, 864 F.3d 45, 52 (1st Cir. 2017). Instead, *González* held that "the federal-sector employment context"—which is comprehensively governed by the Civil Service Reform Act—"meaningfully distinguishe[d] the plaintiffs' case from *Bivens*." *Id.* at 53, n.3.

Date: October 23, 2026

Respectfully submitted,

JUAN SEBASTIÁN CARVAJAL-MUÑOZ.

By his attorneys:

/s/ *Carol Garvan*
Carol Garvan
Zachary L. Heiden
Emma Bond
Max Brooks
ACLU of Maine Foundation
PO Box 7860
Portland, Maine 04112
(207) 619-8687
cgarvan@aclumaine.org
zheiden@aclumaine.org
ebond@aclumaine.org
mbrooks@aclumaine.org

Benjamin R. Gideon
Taylor A. Asen
Rosalie B.C. Wennberg
Gideon Asen LLC
95 Main Street, No.5
Auburn, Maine 04210
(207) 206-8982
service@gideonasenlaw.com
rwennberg@gideonasenlaw.com

James Wagner
Law Office of James Wagner
343 Ocean House Road
Cape Elizabeth, Maine 04107
(207) 400-6038
jamiewagnerlaw@gmail.com

Scott Michelman (D.C. Bar No. 1006945)*
Laura Follansbee (D.C. Bar No. 1782046)*
ACLU Foundation of the District of Columbia
529 14th St. NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
smichelman@acludc.org
lfollansbee@acludc.org

Julie A. Murray (D.C. Bar No. 1003807)*
Matthew R. Segal (D.C. Bar No. 483486)*
American Civil Liberties Union Foundation
15th Street NW, Washington, DC 20005
(202) 675-2326
jmurray@aclu.org
msegal@aclu.org

*Counsel for Plaintiff*

*Admitted *pro hac vice*.